Argued January 18, affirmed February 15, 1921.

# STATE v. BRAKE.

(195 Pac. 583.)

**Criminal Law—At Common Law Conviction may be had on Uncorroborated Testimony of Accomplice.**

1. Under the rule of the common law, the testimony of an accomplice, although not corroborated, may be sufficient to warrant conviction if it satisfies the jury of guilt beyond a reasonable doubt.

**Criminal Law—Corroboration of Testimony of Accomplice must Connect Defendant With Crime.**

2. Under Section 1540, Or. L., declaring that a conviction cannot be had upon the testimony of an accomplice unless corroborated, the corroborating testimony must connect, or tend to connect, the defendant with the commission of the crime, and must be independent of any testimony of the accomplice, and, under the direct terms of the statute, evidence merely relating to the commission of the crime is insufficient.

**Criminal Law—Weight of Corroborating Testimony is for the Jury.**

3. The jurors are the judges of the weight and credibility and effect of testimony which is relied on as corroborating that of an accomplice, and tending to connect defendant with the commission of the crime.

**Criminal Law—Corroborative Evidence Need not be Direct.**

4. Under Section 1540, Or. L., corroborative evidence need not be direct evidence, but the statute is satisfied even though it is entirely circumstantial.

**Criminal Law—Mere Opportunity not Sufficient Evidence of Corroboration.**

5. Mere opportunity is not sufficient corroboration to satisfy Section 1540, Or. L., forbidding conviction on uncorroborated accomplice testimony.

**Criminal Law—Association With Accomplice or Possession of Fruits of Crime Sufficient Corroboration of Accomplice.**

6. Intimate association with accomplice at about the time of the commission of a crime may be sometimes sufficient corroboration to satisfy Section 1540, Or. L., forbidding conviction on the uncorroborated testimony of an accomplice, and possession of the fruits of the crime by itself is sufficient corroboration.

**Criminal Law—Corroboration of Accomplice Need not be of Itself Sufficient to Sustain Conviction.**

7. The corroboration of an accomplice need not be of itself adequate to support a conviction, but it is sufficient to meet the requirements of Section 1540, Or. L., forbidding conviction on uncorroborated testimony of an accomplice, if it fairly and legiti-

mately tends to connect defendant with the commission of the crime.

**Criminal Law—No Precise Rule for Quantum of Testimony Necessary to Corroborate Accomplice Testimony.**

8. Because of the infinite variety of fact situations, no precise rule can be formed for the measurement of the *quantum* of corroborative evidence necessary under Section 1540, Or. L., to sustain a conviction on accomplice testimony, but each case must be governed by its own circumstances.

**Criminal Law—Evidence Held Sufficient to Corroborate Accomplice Testimony.**

9. In a prosecution for murder, corroborative evidence *held* to sufficiently connect defendant with the commission of the crime, as required by Section 1540, Or. L., to warrant conviction on accomplice evidence.

**Witnesses—Stenographer's Notes of Confession of Accomplice not Necessary for Impeachment.**

10. In a prosecution for homicide, where defendant's self-confessed accomplice made a confession which exonerated defendant, and admitted such fact on cross-examination, but asserted its falsity. and there was nothing to show that the transcript of stenographer's notes of such confession were necessary to refresh the memory of the witnesses who were present, it was not error for the trial court to refuse the request of defendant's counsel that the prosecutor be required to produce such notes, for they amounted to nothing more than a private or personal memoranda, and under Section 864, Or. L., need not be exhibited as a foundation for the impeachment of the accomplice, it appearing that he did not sign the transcript of the notes.

**Criminal Law—Notes of Confession not Paper Relating to Merits of Action Which Prosecutor may be Compelled to Produce.**

11. Where defendant's self-confessed accomplice admitted that he made a confession exonerating defendant, which conflicted with his testimony at the trial, a transcript of the stenographer's notes of such confession, not signed by the accomplice, was not a paper relating to the merits of the action, within Section 533, Or. L., and hence the refusal of the trial court to compel the prosecutor to allow defendant's counsel to inspect the same for the purpose of impeaching the accomplice as a witness was not error, it appearing that the trial court was perfectly willing to allow those who heard the confession to be called as witnesses, etc.

From Clackamas: JAMES U. CAMPBELL, Judge.

Department 1.

George L. Moore and Russell Brake were jointly indicted for the crime of murder in the second degree. The indictment accused Moore and Brake of

having killed Harry Dubinsky by beating him on the head and body with "some instruments and weapons" and throwing him into the Willamette River. Moore pleaded guilty and was sentenced to the penitentiary for life. About one month after Moore had been sentenced to the penitentiary, Brake was tried by a jury. The trial resulted in a verdict of guilty of murder in the second degree as charged in the in-- dictment, and Brake appealed from the consequent judgment.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Tom Garland.*

For the State there was a brief over the names of *Mr. Livy Stipp,* District Attorney, and *Mr. Gilbert L. Hedges,* with an oral argument by *Mr. Stipp.*

HARRIS, J.—The appeal presents two questions for decision. It is contended: (1) That the testimony of the accomplice, Moore, who appeared as a witness for the state, was not sufficiently corroborated; and (2) that reversible error resulted from the refusal of the trial court to compel the district attorney to deliver to the defendant a "confession" made by Moore.

1, 2. The contention that the corroboration of the accomplice is not sufficient to meet the requirements of the statute makes it necessary to relate the story of the crime as told by the witnesses. But before attempting to examine the evidence, we should first remind ourselves of the language of our statute. Section 1540, Or. L., reads as follows:

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with

the commission of the crime, and the corroboration is not sufficient if it merely show the commission of the crime, or the circumstances of the commission."

Under the rule of the common law the testimony of the accomplice, although not corroborated, may be sufficient to warrant a conviction if it satisfies the jury beyond a reasonable doubt of the guilt of the defendant. Our statute, like the statutes in many other states, is in effect a legislative declaration that it is dangerous to permit convictions *upon* the uncorroborated testimony of the accomplice, and for that reason the statute in substance provides that juries shall not convict any accused person *upon* the uncorroborated testimony of an accomplice, even though they unqualifiedly believe the testimony of the accomplice.

The statute uses precise language. It is not necessary that there shall be corroborating evidence concerning every material fact as to which the accomplice testified, and it is not necessary that the whole case shall be proved outside the testimony of the accomplice; for, if the statute contained such a requirement, accomplice testimony could never avail anything except as cumulative evidence. Our statute in plain words permits a conviction "*upon* the testimony of an accomplice"; with the limitation, however, upon such permission, that the accomplice shall be corroborated "by such other evidence as tends to connect" the defendant with the commission of the crime. The language of the statute is "other evidence"; and, hence, the corroborative evidence must be independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect, the defendant with the commission of the crime charged; and, furthermore, the tendency of

the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice testimony, tend to connect the defendant with the commission of the crime.

Evidence which relates exclusively to the commission of the crime or to the circumstances of the commission is not sufficient. The requirement of the statute is not satisfied by producing evidence showing that a crime was committed by some person or persons; but there must be evidence, independently of the accomplice testimony, tending to show that the defendant was *connected* with the commission of the crime.

3. The "other evidence" required by the statute need only tend to connect the defendant with the commission of the crime charged. Of course, the jurors are the judges of the weight, credibility, and effect of the testimony under proper instructions; and, hence, if they disbelieve the corroborative evidence, they are required by the imperative command of the statute to acquit the defendant, even though they believe the testimony of the accomplice standing alone and by itself; for a conviction cannot be sustained if in the end it is in truth rested exclusively upon accomplice testimony. There must be some other evidence fairly and legitimately tending to connect the defendant with the commission of the crime, so that it can in truth be said that his conviction is not based entirely upon evidence of the accomplice.

4. The corroborative evidence need not be direct evidence; but the statute is satisfied even though the evidence is entirely circumstantial.

5. Mere opportunity is not alone sufficient.

6. Intimate association with the accomplice, however, at or about the time of the commission of the crime, and in the neighborhood of the place where the crime was committed, may sometimes be sufficient, especially where the defendant and the accomplice were not only together, but had the fruits of the crime in their possession. Indeed, possession of the fruits of the crime has been held of itself sufficient corroboration of the accomplice to sustain a conviction, even in the case of homicide: *State* v. *Townsend*, 19 Or. 213, 217 (23 Pac. 968); *State* v. *Russell*, 64 Or. 247, 249 (129 Pac. 1051); *State* v. *Turnbow, ante,* p. 270 (193 Pac. 485, 487, 489); *People* v. *Becker*, 215 N. Y. 126 (109 N. E. 127, Ann. Cas. 1917A, 600); 16 C. J. 696, 701, 704, 705, 708.

7. The corroboration need not be of itself adequate to support a conviction; but it is sufficient to meet the requirements of the statute if it fairly and legitimately tends to connect the defendant with the commission of the crime: 16 C. J. 711. See, also, *State* v. *Townsend*, 19 Or. 213, 217 (23 Pac. 968).

8. Because of the infinite variety of fact situations, no precise rule can be formed for the measurement of the *quantum* of corroborative evidence necessary to sustain a conviction, but each case must be largely governed by its own circumstances: 16 C. J. 712.

9. George L. Moore and Russell Brake worked in one of the mills at Oregon City, and there, as early as a couple of months prior to the homicide, became acquainted with each other. From Oregon City they went to Portland; and on either the 19th or 26th of May, 1920, they went together to the home of J. W. Davis at 216 Polk Street in St. Johns, and there rented from Davis a single room having in it one

bed.    The house was a two-story structure, and the room assigned to Moore and Brake was on the second floor.    Davis and wife occupied a room which was also on the second floor, and close to the room rented to Moore and Brake.    Immediately after renting the room Moore and Brake secured employment at the Western Cooperage Company.    Each day they began work at 5:30 p. m. and quit at 3 a. m., and it was usually about 3:15 a. m. when they returned from their work to their room.    Davis had another roomer who also worked at the Western Cooperage Company; and, although this roomer's hours of work seemed to have been the same as those of Moore and Brake, the latter two always reached the Davis home a few minutes before the other roomer arrived there. Moore continued to work until Friday, June 11th; but Brake did not work after Tuesday the 8th or Wednesday the 9th of June.

Saturday afternoon, June 12th, Brake rented a Ford automobile from W. R. Couchman, who conducted a garage in Portland.    Brake and Moore drove this automobile to Oregon City, leaving Portland about 2 p. m., and returning to Portland about 5 p. m.    Moore was not present at the very moment when Brake rented the automobile; but Brake left Moore about a block away from the garage and went alone to the garage, rented the car, and then returned with it, and picked up Moore at the place where he had been left.

Harry Dubinsky purchased, on May 26, 1920, a new Studebaker "big six touring car," and he used it as a "for hire" car.    His "stand" was at the corner of Sixth and Washington Streets, in Portland. The car had been run but a comparatively short distance prior to June 13th.    Dubinsky's body was

found on June 20, 1920, in the Willamette River, in about 110 feet of water, and at a point 150 feet below the bridge, which spans the river at Oregon City, and about 250 feet from the east shore. An examination of the head disclosed that Dubinsky had been severely beaten with some weapon; for, as a medical witness said, his skull was so badly fractured that the base of it was divided "into a number of pieces like a mosaic."

The account of the crime, and the events which preceded as well as those which followed it, as told by Moore, will be made clearer if at this point we say that there was testimony given by Moore from which the jury could have found that Moore and Brake had talked of stealing an Oldsmobile car bearing the license number 50,479, which they had frequently seen parked "near the Willamette Hotel" during the period of their employment at the mill in Oregon City, and that they "were going to take the car back east." If the jury believed the testimony of Moore, they were warranted in finding that on either Thursday, June 10th, or Friday, June 11th, Brake had stolen a license plate from some other vehicle in St. Johns, and that when Moore and Brake made the Saturday afternoon trip to Oregon City in the Ford car they did so for the purpose of making preparations for stealing the Oldsmobile car; for on that afternoon Brake took with him the stolen license plate, and "went up the steps * * on Fifth Street," in Oregon City, and left the plate there. There was also evidence from which the state could have argued that, when Moore and Brake left Portland with Dubinsky on Sunday morning, June 13th, they did so with the intention of stealing the Oldsmobile car, but that after arriving in Oregon City they changed

their plan and concluded to steal the Dubinsky car; and we may add that the reason for such change is problematical, for the change may have been because the Dubinsky car, being new, struck their fancy, or it may have been because Brake could not find the Oldsmobile car or any other satisfactory car in Oregon City. We now come to the story told by Moore.

If Moore told the truth the facts were as follows: About 1 o'clock Sunday morning, June 13th, Moore and Brake went to Dubinsky, who was then with his car at his "stand" at the corner at Sixth and Washington Streets, and arranged with him to take them to Oregon City, and they immediately left Portland, going south on Sixth Street. Brake "told the driver he was coming up [to Oregon City] to collect a debt." When they arrived in Oregon City they parked the car on the south side of Fifth Street and not far from Main Street. Brake then went up the "same steps he went before when" on Saturday afternoon he went up the steps with the license plate. Moore and Dubinsky "went over to a restaurant * * just across on the corner * * across Main Street," and got "something to eat." After being in the restaurant about thirty minutes, Moore and Dubinsky came out on the street, and there met and talked with Edward Surfus, a night policeman of Oregon City. After talking with Surfus "some," Moore and Dubinsky went back to the car, and when they arrived there Brake "was sitting in the back seat." Dubinsky and Moore then got in the car; Dubinsky took his seat at the wheel and Moore sat in the front seat beside Dubinsky. Just as the car left, or while it was being turned around on Fifth Street "and getting ready to leave Oregon City," Brake said to

Moore, "This is our car," and from that statement
Moore understood that they were to steal Dubinsky's
car.  As the car left Oregon City, Brake was behind
the front seat, but "was leaning on the front seat,"
and he wore "a soft brown hat."  They left Oregon
City, and proceeded on their way toward Portland,
until they reached a point about two miles south of
Milwaukie, and there Dubinsky stopped the car in
obedience to Moore's request.  Brake had at about
that time suggested to Moore that the latter ask
Dubinsky to stop, and, although Moore told Dubinsky
that he wanted to get out for a minute, he fully under-
stood that the real purpose was to enable Brake to
accomplish the plan to take the car.  When the car
stopped Moore stepped out a few feet from the car,
and as he did so heard a groan, and looked around
and noticed "Brake hit Dubinsky after I looked
around."  There was a tire chain on the floor of the
car, and Moore thought that Brake beat Dubinsky
with this chain.  Dubinsky, who was then either un-
conscious and utterly helpless or dead, was placed
by Moore and Brake on the floor of the car between
the front and back seats.  Moore took Dubinsky's
"purse out of his pocket and handed it to" Brake.
They turned the car around, and with Brake at the
wheel and Moore in the back seat, they returned to
Oregon City, drove on the bridge, and threw Dubin-
sky's body into the Willamette River.  Moore and
Brake then drove to the end of the bridge, turned
around, and drove directly to and through Portland
and "went back to St. Johns," arriving there about
4:30 Sunday morning.  They parked the Dubinsky
car in a street about a block from the Davis house.
There was blood in the front seat and also "on the
carpet" in front of the back seat.  Before leaving

the car they "found a piece of waste in one of the pockets of the car and wiped off some of the blood with it"; and after wiping off some of the blood they threw the waste "down on the ground around the car."

Before reaching Portland, Moore and Brake stopped and removed the two license plates from the car, and then on the rear end of the car they attached the plate which Brake had stolen the preceding Thursday or Friday, thus leaving the front end of the car without any license plate. After parking the car and wiping off some of the blood, Moore and Brake together went to the Davis house. Moore removed his shirt, washed the blood off the cuffs and put on a clean shirt. There was a little blood on one of the legs of his trousers, and he "washed that off." After remaining in the Davis house for about an hour Moore left pursuant to an understanding with Brake that Moore would go to Oregon City and inspect the bridge to see whether any signs of blood had been left upon the bridge, and that after inspecting the bridge Moore would return to Portland and meet Brake, who agreed to be with the Dubinsky car at the end of the Broadway bridge in Portland at about 10 o'clock A. M. It was about 5:30 A. M. when Moore left the Davis house. He took a street-car to Portland, and from thence he went to Oregon City in an electric car. Moore returned to Portland, and he and Brake met at about the time and the place agreed upon, Brake having the Dubinsky car with him. Moore made a report to Brake of his trip of inspection, and Brake said "it was all right." Moore explains that they did not immediately "drive east" when they got the Dubinsky car, because Brake said "he wasn't afraid to

stay around Portland until Monday, and I agreed to stay with him.'' Moore got in the car at the end of the Broadway bridge and the two rode ''around town in Portland'' for ''a couple of hours,'' and then they parked the car on Tenth Street south of Washington Street and ''went to a restaurant and had something to eat.'' After eating and ''walking around awhile'' they again got in the car, and ''drove around awhile,'' and about 3 P. M. parked the car on Nineteenth Street. Moore and Brake then ''came downtown together and stayed around for about an hour,'' and at about 4 P. M. Brake left Moore, saying ''he was going to see his girl in the car.'' In about an hour and a half Brake returned and met Moore in front of the Imperial Hotel. Brake had left the car near the corner of Eleventh and Burnside Streets. At about 6:30 P. M. Moore and Brake went to get the car at Eleventh and Burnside Streets so that they could take their girls riding; but before reaching the car they noticed one or more policemen around it (the police had discovered the automobile and were watching to see who came after it). Upon discovering that the car was being watched, Moore and Brake remained away from it; and notwithstanding their discovery each called upon the respective girl with whom he had an engagement, and each made to such girl an excuse for not having the car with him. On the following Friday, June 18th, Moore and Brake were arrested in Portland.

We now direct attention to the evidence relied upon by the state to corroborate Moore, the accomplice. W. R. Couchman testified that he rented a Ford car to Brake on Saturday afternoon June 12th, and, that, when Brake rented the car, he said that he wanted to

go to Oregon City. Couchman says that Brake returned with the car "that evening."

M. W. Koontz had a car and used it "in the for-hire business." Koontz had his stand at the southeast corner of Sixth and Washington Streets; he says that on Sunday morning, about ten minutes before one o'clock, he saw Dubinsky "pull away" and drive south on Sixth Street with a party in the car, but that he could not tell how many were in the car with Dubinsky, nor whether there was more than one, although he was able to say "they were in the back seat whoever they were."

Edward Surfus, the night policeman of Oregon City, stated that at about 2:10 o'clock Sunday morning, June 13th, he saw Moore and Dubinsky on Main Street in Oregon City. The three, Surfus, Moore, and Dubinsky, walked down Main Street "toward Fifth Street," and, in the language of Surfus, "we stopped there a second or two, and Moore said to Dubinsky: 'He ought to be there by this time.' I don't know who 'he' meant. We were about six feet from the curb, and Moore stepped to the curb and he said: 'He is there,' and just then someone at the car gave the horn a honk, and he said: 'Come on,' and he and Dubinsky walked off." Surfus saw Moore and Dubinsky get into the car. Surfus says that the Dubinsky car passed him going towards Portland with Dubinsky at the wheel and Moore "sitting in the seat with Dubinsky." Surfus also stated that there was "another fellow" who wore a soft felt hat in the back; "he was not in the back seat, but he had his hands on the seat leaning forward." Thus far there is no corroborative evidence tending to connect Brake with the commission of the crime; for the most that the evidence shows is that Dubinsky left Portland at the time

claimed by Moore with some person or persons in the car, and that Moore and Dubinsky were in Oregon City at 2:10 o'clock Sunday morning with an unidentified third person in the car. There is other evidence, however, independently of the testimony of Moore, which tends to connect Brake with the commission of the crime.

It will be recalled that another person besides Moore and Brake roomed at the Davis house and worked at the Western Cooperage Company. There is a bathroom near the Moore and Brake room in the Davis house. Davis says that he was awakened by the striking of the clock, and that on Sunday, June 13th, at 3:15 A. M. as usual, this other person returned to his room from his work at the Western Cooperage Company, and that "in the course of half an hour or so" two persons came in and went directly to the bathroom, where they remained "longer than common." Although he cannot fix the time definitely, Davis says that after the two persons came into the house together and went to the bathroom, as already related, one of them left the house, and it "ran through my mind, what the devil is he going out for?" Davis did not see the two persons, and for that reason cannot say positively that they were Moore and Brake, although he thought at the time and assumed that the two persons were Moore and Brake. When the man who returned at about 3:15 A. M. from his work came into the house, every roomer was accounted for except Moore and Brake.

An alibi was claimed by Brake. He testified in his own behalf, and said that he left Portland on the street-car and got to his room "around 3:30" Sunday morning, and immediately went to bed; and when

asked whether he made up the bed when he arose, he said that he did not. Davis testified that when he arose Sunday morning the circumstance of the person having left the house, as previously related, "was on my mind again," and for that reason he looked in the Moore and Brake room at "about half-past 6" Sunday morning, and "knew there had been nobody sleeping in that room that night. The bed was just the same as it was the evening before. * * Nobody had slept in it."

Bertha Shodahl had been acquainted with Brake for about two months, and he called upon her frequently. Saturday afternoon, June 12th, he called at her house about 5 o'clock driving a Ford car, but after a short conversation he left, saying that he would call her up later. About 6 o'clock, "or a little later," he called her up on the telephone, and at that time she asked him if "he was coming up that evening" and "he said he would be busy that evening." Brake called the Shodahl house by telephone Sunday morning about 8 o'clock, but was unable to get Bertha. About 9 A. M. Sunday morning, June 13th, he appeared at her home with a new Studebaker car, and Brake and the girl rode around in the car for about an hour. When she stepped into the car she noticed the blood on the front seat, and she said: "I asked him: 'What is that?' and he said: 'That is oil.' I said: 'It looks like blood.' He said: 'Well, at home I have spilled oil in my car and I know it looks like that.'"

While riding around he told her that he bought the car from a garageman, and had paid $2,700 for it; and he also explained to her that "the reason he could not see her that evening he had to wait for a telegram from his father sending him the money to buy the car." She next saw Brake Sunday afternoon, and she rode

with him in the Studebaker car "probably, an hour
and a half or two hours." She saw him again on
Sunday, when, at about 7 o'clock in the evening, he
came to her home without the car. At first he ex-
plained his failure to bring the car by saying that
he had a blow-out and could not get the tire fixed
until Monday. He visited with Miss Shodahl until
about 11 P. M.; and at sometime during the evening
he stated to her that he had lied about the car, and
that the truth was that he had bought the machine
from two crooks at about 2 o'clock Sunday morning.
Brake further told the girl, at some time during that
same evening, that he had parked the car and he and
Moore "went up to get it, and saw the officers around
the car. * * A little later he heard on the street some-
body had been murdered, and so he would not go near
that murder car." In this connection it is proper to
add that the record indicates that the tragedy had
not then become known "on the street." There are
many additional circumstances to which Bertha Sho-
dahl testified which when taken singly weigh little, but
when taken collectively tend strongly toward the guilt
of Brake; for example, the next day, when Bertha
Shodahl saw an article in the newspaper about Dubin-
sky, and remembering Brake's statement made to her
on the preceding day, her suspicions were aroused and
on that account in company with her mother and
brother she hunted up Brake, and told him that he
should tell the police about how he came into posses-
sion of the car, inasmuch as he had purchased it with
money received from his father. A complete state-
ment of Brake's excuses for not wishing to talk with
the police would unduly lengthen this opinion, but
suffice it to say that they produced an inculpating,
rather than an exculpating, tendency.

When arrested on June 18th Brake stated to members of the police department that he had purchased the car at about 2 o'clock Sunday morning June 13th for $2,700, and that he paid $2,500 in cash which he then had in his pocket, and that he had promised to pay the remaining $200. When asked by one of the policemen about the blood in the car "he said there was some grease in it, but no blood." It is a significant fact, too, that on Sunday Brake told the girl, among other things, that the men from whom he bought the car told him "that just as soon as he could bring the car up there they would wash it all up; this was blood—oil on the car, and they would clean it up for him."

The evidence showed beyond any question whatever that the car which Brake drove on Sunday, June 13th, was the Dubinsky car. Furthermore, Brake admitted, when testifying in his own behalf, that pursuant to agreement he met Moore with the car at the end of the Broadway bridge at about 10 o'clock Sunday morning. In the seat of the car was found a piece of pasteboard fashioned like a license plat, and on it had been printed with a lead pencil a number and lettering corresponding with the numbering and lettering of the stolen license plate which Moore and Brake had attached to the rear of the car. Brake admitted that he prepared this pasteboard plate Sunday morning after Moore left the Davis house. The waste which had been used to wipe the blood off the car was found in the parking between the curb and sidewalk near the place where Moore said the car had been parked; and at the same place was found one of Dubinsky's business cards "sort of crumpled up."

Brake claimed an alibi. He said that he last saw Moore at 9:30 Saturday evening; that he went to a

theater and at about 11:30 o'clock he went to a dance-hall on Broadway Street, and remained there, but outside the hall, until about 12:30 Sunday morning, when he went to the Imperial Hotel, and from the hotel crossed Broadway Street and entered a restaurant; that after eating he went to the corner of Broadway and Washington Streets, and there bought a newspaper, and came back to the Imperial Hotel, entered and sat in a chair in the hotel lobby; that while there he purchased two cigars from the clerk at the desk where the guests registered; that he afterwards went to a restaurant across from the hotel on Washington Street, and then about 2:30 Sunday morning boarded a street-car and started for St. Johns; that he was in bed asleep when Moore came in, but that Moore's entrance wakened him; and that after Moore came into the room Moore told him that he (Moore) had stolen an automobile.

The alibi relied upon by Brake was weakened not only by the evidence already mentioned, but also by the testimony of the house detective, who was on duty at the Imperial Hotel from 9 P. M. Saturday until 4 A. M. Sunday. If Brake was in the hotel lobby as he claimed, then he was there from about 1 A. M. until after 2 A. M. Sunday. The house detective testified that every morning at 1 o'clock every person, except guests, is compelled to leave the hotel, and that after that hour none except guests are permitted to remain in the lobby, and that it was his duty to enforce this regulation. The house detective also stated that in the month of June the clerk at the desk did not handle the cigars, but that the night bell-boy handled them "in the check-room." There was a cigar-stand in the lobby such as is frequently found in hotels, but when this stand closes for the day, as it did before 1 A. M.,

the cigars were handled by the bell-boy at the check-room and not at the cigar-stand nor at the clerk's desk, according to the testimony of the house detective.

Thus it is seen that there was corroborative evidence tending to show preparation by Brake; as, for example, the trip to Oregon City in the Ford car, and the excuse made to Bertha Shodahl, about 6 o'clock Saturday evening, to the effect that he would be busy that evening. There was evidence that Brake falsified in his attempt to establish an alibi; as, for example, the testimony of the house detective with reference to the cigars; and the testimony of Davis with reference to the condition of the bed. There was corroborative evidence of the most positive kind that somebody was with Moore and Dubinsky in Oregon City Sunday morning; and there was an abundance of circumstantial evidence which not only fairly and legitimately, but strongly, tended to show that that somebody was Brake. The evidence is indisputable that Brake was in possession of the Dubinsky car as early as 9 A. M. Sunday, June 13th. Brake did not deny, but on the contrary he admitted, when testifying on his behalf, that he made to Bertha Shodahl the statements which she says he made to her about the car on Sunday. The law only requires that degree of corroborative testimony which fairly and legitimately tends to connect the defendant with the commission of the crime; but the evidence in the record rises to a higher degree than that required by the statute. The contention that there is not sufficient evidence to meet the requirement of Section 1540, Or. L., cannot be sustained.

Moore made three "confessions": The first on June 18th, the day of his arrest; the second on June

21st; and the third on June 30th. The first and third agreed with each other and with his testimony at the trial; but the second differed from the first and third confessions as well as from his testimony at the trial, for in his second "confession" he is said to have asserted that he committed the crime 'alone and that Brake was in nowise a participant.

On June 21st Moore and Brake waived examination, and were bound over by a justice of the peace to await the action of the Clackamas County grand jury. An indictment against Moore and Brake was returned on July 27, 1920, and on July 28th Brake was arraigned and pleaded not guilty. On July 2d Brake filed a motion in the Circuit Court for an order directing the district attorney to furnish Brake's attorney "with a copy of the confession known as the 'second confession' of George Moore." The Circuit Court refused to make such an order. Brake was tried in Clackamas County in September, 1920.

It appears from the record that Moore was confined in the Multnomah County jail on June 21st, and that on that day, at his request, he was taken to the office of the district attorney of Multnomah County, and there, in the presence of three persons, including a stenographer, a deputy sheriff, and Earl C. Bernard, a deputy district attorney of Multnomah County, Moore made the second confession. It appears from the record also that this confession was made orally, and that stenographic notes of what Moore said were made by the stenographer; and, although the record does not directly so state, we think that it is fair to infer, and, hence, we shall assume that the stenographic notes were transcribed, and that the transcription was in the possession of the district attorney of Clackamas County, or his deputy, at the time of the

trial. Moore appeared as a witness for the state; and, when the district attorney concluded, with the direct examination, he submitted the witness for cross-examination; and almost immediately Mr. Garland, the cross-examiner and attorney for Brake, began to ask Moore about the second confession. After developing the fact that Moore had made a statement, and that it was "taken down" in shorthand, Mr. Garland stated that he "would like to make a request and demand on the district attorney that they allow me an inspection of that statement, or a copy of it, for the purpose of impeaching this witness; * * on the theory you have a right to impeach any witness by showing that at other times and places they have made different statements * * ." The court ruled that the defendant was not entitled to an inspection of the "confession"; and thereupon Mr. Garland continued his cross-examination, and developed the further fact that in the second "confession" Moore had said that he alone committed the crime, and that Brake was not with him, and that in that confession Moore "told them the way I did it myself." After the witness had explained that he made the second "confession" because he acted on the advice of "older heads and fellows that had been over the road," the following colloquy between Mr. Garland and the court occurred:

"Mr. Garland: Well, now, if your honor please, I request again that we be given a copy of the original statement, to impeach this man.

"Court: You can't have any better statement than he has made now. He says at that time he told them an entirely different story, and that Brake was not with him.

"Mr. Garland: It is an extended statement, and my contention is I have a right to show how he claimed the crime was committed at that time.

"Court: You can ask him that.

"Mr. Garland: I don't know. This is for the purpose of impeachment.

"Court: Ask him how it was.

"Mr. Garland: I don't know what it was to impeach him.

"Court: You don't need to lay any foundation where he admits it all himself.

"Mr. Garland: Well, if your Honor please, I would like, in addition to that demand, the statement for the purpose of showing that this defendant has a defense—to show that someone else has committed the crime. Now, in that statement we will show that Moore insisted he committed it, and how it was done.

"Court: Moore is willing to tell you that right now.

"Mr. Garland: Yes; but I don't know whether he will give me all the facts so we can emphasize it.

"Court: That is a fishing expedition. You can find out by asking him now what he told them. He admits he told an entirely different story from what he told here now."

Moore explained that the second confession was not true, for in that confession he asserted that he committed the crime alone and that Brake was not implicated. It is of course apparent that the second confession contradicted his sworn testimony that Brake was a participant.

What was this paper referred to as the "second confession"? It consisted either of stenographic notes or a transcript of those notes. We shall assume that the "second confession," which the defendant sought to procure, was a transcript of the notes made by the stenographer. It does not appear that Moore directed the notes to be made, or that he approved, or that he signed them. Nor does it appear that Moore directed that the notes be transcribed, or that he approved the transcript, or signed it, or even knew before being called as a witness that a transcript of the

notes had been made. At most the transcript was only the private memoranda of the district attorney made for him by or under the direction of his representative.

10. Counsel for defendant declared that he wanted the writing for the purpose of impeaching Moore, and it is now contended that the district attorney should have been compelled to deliver the document so that it could have been used for that purpose. If it be supposed that the writing had been delivered, is it not manifest that the writing itself could not have been introduced as evidence of statements made by Moore? The persons who were present and heard Moore's oral statements, constituting the second confession, were the witnesses by whom Brake was obliged to prove those statements, for they, and not the writing, were the original sources of information. If it be said that the stenographer who made the notes and transcript or that the deputy district attorney or deputy sheriff, who were also present, may have needed the writing for the purpose of refreshing the recollection, the answer is that there is nothing in the record to indicate that any of such three persons needed the writing for that purpose: *State* v. *Magers,* 36 Or. 38 (58 Pac. 892). If the writing itself had been signed by Moore, or perhaps if he had approved it as being a correct record of his statements, the writing would have constituted evidence of those statements. But where, as in this case, the writing itself is not competent evidence of the statements purported to be recorded, and amounts to nothing more than a private and personal memoranda, it does not come within the embrace of Section 864, Or. L., and need not be exhibited as a foundation for the impeachment of the witness; and therefore the defendant cannot success-

fully contend that he was entitled to have the second confession for the purpose of showing the paper to Moore, and thus lay the foundation for his impeachment: *State* v. *Goodager,* 56 Or. 198 (106 Pac. 638, 108 Pac. 185). If Moore had signed the confession, quite a different situation would have been presented: *State* v. *Steeves,* 29 Or. 85 (43 Pac. 947). The case of *People* v. *Becker,* 210 N. Y. 274 (104 N. E. 396), relied upon by the defendant, is essentially and materially different from the instant case, for there the confession made by Rose was prepared by him, and the contract made by Vallon was signed by him.

The instant case is likewise to be distinguished from other cases relied upon by the defendant, in which different courts have held that an accused was entitled to impeach a witness by showing contradictory statements made to a district attorney. It may be assumed for the purposes of this discussion that when Moore admitted on the witness-stand that his second confession was false, the statements made by him on June 21st ceased to be privileged, even though it be further assumed that they were originally privileged: *People* v. *Davis,* 52 Mich. 569 (18 N. W. 362); *Cole* v. *Andrews,* 74 Minn. 93 (76 N. W. 962); *Marks* v. *Beyfus,* 25 Q. B. Div. 494. The trial court did not refuse to permit the defendant to call as a witness any of the three persons who heard the second confession. The court did not prevent the defendant from proving the contradictory statements of the witness. All the court did was to refuse to compel the district attorney to deliver something which was not evidence, but was in effect private memoranda only. There was no attempt by the trial court to confine the cross-examiner within narrow limits; but, on the contrary, the

court made it plain to the defendant that a wide latitude would be allowed.

11. If it be assumed that Section 533, Or. L., governs criminal as well as civil actions, nevertheless, it is obvious that the second confession is not a paper coming within the embrace of that section, for the reason that it is not a paper "relating to the merits" of the action: *State* v. *Rhoads,* 81 Ohio St. 397 (91 N. E. 186, 18 Ann. Cas. 415, 27 L. R. A. (N. S.) 558).

In no possible situation could evidence of Moore's contradictory statements, whether that evidence consisted of the oral testimony of the three persons who were present or consisted of the writing, have been used as substantive evidence concerning the merits of the action. Impeachment of Moore was the only purpose for which the defendant could have used the contradictory statements made by Moore. We may assume for the purposes of this case that the contradictory statements were not privileged, and that, therefore, the defendant was entitled as a matter of right to avail himself of whatever constituted competent evidence of those contradictory statements. The right to use the contradictory statements existed only because they constituted evidence in behalf of defendant; but the right to use these statements was limited to the right to employ competent evidence of them. The defendant was obliged to prove the contradictory statements by the oral testimony of the witnesses who heard the statements. The writing was not evidence of the statements. When the defendant asked for an inspection of the second confession he asked for that which was not evidence. The writing, in the circumstances shown here, amounted to nothing more than personal and private memoranda made for the

district attorney by or under the direction of his representative.

Our conclusion is that the trial court properly refused to compel the district attorney to permit the defendant's attorney to inspect the second confession; and this conclusion, in the circumstances presented here, is supported by nearly every, if not every, adjudicated case reported in the books: *State* v. *Yee Guck, ante,* p. 231 (195 Pac. 363); *State* v. *Rhoads,* 81 Ohio St. 397 (91 N. E. 186, 18 Ann. Cas. 415, 27 L. R. A. (N. S.) 558); *Sentry* v. *State,* 67 Wis. 65 (30 N. W. 226); *People* v. *Glaze,* 139 Cal. 154 (72 Pac. 965); *Spicer* v. *State,* 188 Ala. 34 (65 South. 972); *State ex rel.* v. *Steele,* 117 Minn. 384 (135 N. W. 1128, Ann. Cas. 1913D, 343); *Havenor* v. *State,* 125 Wis. 444 (104 N. W. 116, 4 Ann. Cas. 1052). The basis of our conclusion is that, assuming that the contradictory statements were not privileged, the defendant could not have proved them by introducing the writing, because it was not shown to have been such a document as was evidence of the statements, but he was obliged to prove the statements by the oral testimony of the witnesses who heard them, and he made no attempt to prove them in that manner.

The defendant was ably defended, and he had a fair trial. The judgment is affirmed.  .  .  AFFIRMED.

BURNETT, C. J., and BENSON and McBRIDE, JJ., concur.