Argued June 29; affirmed July 26, 1932

## STATE *v.* YOUNG
### (13 P. (2d) 604)

*James W. Mott,* of Salem, for appellant.

*Lyle J. Page,* Deputy District Attorney, of Salem (John H. Carson, District Attorney, of Salem, on the brief), for the State.

BROWN, J. The facts shown by the record are about as follows:

One evening during the latter part of April or first of May, 1930, while Lucile Howard, a young woman about nineteen years of age, who, though married, was

separated from her husband, was walking along High street near State, in the city of Salem, she was accosted by the defendant, a stranger, about thirty years of age, who, after a short conversation, took her for a ride in his automobile. The acquaintance thus begun continued until they were apprehended in room 316 of the Senator Hotel on May 31, 1930, by Police Officer Edwards assisted by Officer Clayton. Concerning the circumstances surrounding the arrest, Officer Edwards testified:

"I rapped on the door, I think a couple of times, maybe three times, and finally Mr. Young came to the door, and I asked if his name was Young, and he said it was, and I told him a couple of officers would like to speak to him, and I shoved my foot in the door and walked in. * * * I asked if there was anybody else in the room with him, and he said, 'No.' * * * I said, 'I think you have a woman in here, you know I will find out if you have or not.' And he said, 'Yes, I have.' I said, 'Is she your wife?' He said, 'No.' I asked him, 'Where is she?' and he said, 'Taking a bath.' * * * I heard the woman * * * and finally I pushed the door back a little and noticed her standing on the inside * * *. She was almost nude at that time. * * * She came and rapped at the door and called for her clothes, and he said, 'Give her her clothes.' And I said, 'You give them to her.' So he handed her some clothing that was laying on the side of the bed.

"Q. What clothing was it? A. A pair of pants and some stockings, and I think there was maybe a skirt. * * * She finally came out, and he hadn't got on his clothes, at least all of them. * * * He had on a bathrobe, and his pajamas, and a pair of bedroom slippers, at the time I went in the room."

After their arrest, the officers took them to the office of the district attorney. Thereafter, Mrs. Howard entered a plea of guilty to an indictment charging

her with a like offense and as a joint actor with defendant Young in the commission of the unspeakable crime hereinbefore named.

As to her first acquaintance with this defendant, Mrs. Howard testified that, while she was waiting for a boy friend at the corner of High and State streets in the city of Salem one evening about the last of April or first of May, 1930, she met Young in the company of a boy friend known as "Art"; that Young said, "Hello, Girlie," and asked her to talk to him; that he claimed to be from California and was lonesome and anxious to become acquainted with people here, and that she went for a ride in the country with him, returning about ten o'clock p. m.; that she met him more than a week later and that they took an automobile ride past the penitentiary, and that he stopped the car "on the other side of the penitentiary where the road * * * used to be, * * * and he wanted me to have intercourse with him and I wouldn't, and he kept on coaxing me, and finally he wanted me to go down on him, and I didn't want to, and he kept on asking me to." She testified that she took a third ride, but that no unnatural act was committed during that ride; that, after that time, they were out most every night "for quite a while," and that during one of these rides another like transaction took place in Polk county near the Horst hop yard, and still another on the evening of May 12th, when they accompanied by "Art" and Enid Gartner, one of her girl friends, drove out to Lake Labish. The indictment resulted from the commission of the offense on the last named date. Concerning this particular trip and the incidents relative thereto, Mrs. Howard testified:

"Q. Whereabouts did you meet up with this defendant on that evening? A. He came to the house.

"Q. And was Enid Gartner at your home? A. Yes.

"Q. And what time was it, about, when the defendant arrived? A. About 7:00 or 7:30.

"Q. And with him was this fellow, Art? A. Yes.

"Q. They came over there in the automobile? A. Yes.

"Q. What kind? A. Reo coupe.

"Q. Is that the same car which you had been riding around in with the defendant? A. Yes.

"Q. Where did you go to from your home? A. Out toward Lake Labish.

"Q. How were you girls disposed in the car? You were in the front seat? A. Yes.

"Q. Where was Enid Gartner? A. She was sitting behind me, in the rumble seat.

"Q. Who was with her? A. Art. He was sitting behind Young.

"Q. No one else along besides the four of you? A. No.

"Q. The defendant was in the front seat with you, operating the car? A. Yes.

"Q. Immediately after leaving your home where did you go? A. We crossed the river and came through town.

      \*      \*      \*      \*      \*

"Q. About how far out from the city did you go from Salem? A. I think about four or five miles.

      \*      \*      \*      \*      \*

"Q. Whereabouts did you stop out there, Lucile? A. We turned off the highway * * * and drove through a grove * * * and turned around in the grove, and then we parked * * *.

"Q. Did you stop in the grove? A. Yes.

      \*      \*      \*      \*      \*

"Q. Go ahead. What happened? A. Then Young asked me to go down on him, and I started to, but I didn't then.

"Q. How far did you go in that respect? A. I put it in my mouth.

"Q. That is, the private parts of his person? A. Yes.

"Q. That is while you were in the front seat of this Reo car belonging to the defendant? A. Yes.

"Q. Go on, please. A. Well then, Art in the back seat whistled, and I quit then, and then Art asked Enid to go down on him. She wouldn't do it, and Art said, 'Be fashionable.' He said, 'Everybody does it.' She said, 'Here is one that doesn't.' I said to Enid, 'Go on. Be a sport.' And then Young said some doctor said that was the most healthly way to do, and he said it was the most clean way. And then Art got mad because Enid wouldn't go down on him, and so he said, 'Let's go home.' So we went home from there."

She testified that she rode with the defendant during the days that followed, and that he asked her to go to work in a house in Seattle for him, which she described as a "house where you go and keep company with men, and entertain them." Concerning the details of his offer, she testified:

"I was to work for him, and he was to pay me. I was to turn over my money to him, and he was to pay me, and he said I could help my folks that way, and also have my clothes and have money. * * *. He was going to take me to Portland and put me on a car to Seattle or Tacoma. * * * He said if I would work for him until we got started good, then he would marry me."

She testified that, some time in May, Young went to Puget Sound, and, while there, wrote her a card, and also wrote her a letter in which he said "he would try and get his business done so he could get back, and then he would be ready to take me with him. He said for me to be ready to go with him." It appears that, during his absence, her family went to the berry patches near Silverton, and upon his return he hunted her up; that, when he found her, "he kept telling me he wanted me to go back with him; that he had found everything in Seattle all right; Seattle or Tacoma";

that she prepared to accompany him to Portland, but that before leaving they returned to his room at the Senator Hotel, and "while we were in the room Dunn and another man came." As to the conversation that followed, she testified:

"Q. That is Al Dunn that you had met through this defendant? A. Yes.

"Q. Who else came up? A. Some other man with him, I don't remember who it was, and then they stayed and talked a long time.

"Q. What was said there? Was the defendant present all the time? A. Yes.

"Q. What was said there? A. They were talking about these houses, and about the girls in the houses, and Young—that is, Dunn, said that if I didn't know people around here he would like to put me in one of the houses here, because they needed a girl just my size, and Young said he thought if they would bleach my hair nobody would know me, but he said it would be taking too big chances.

"Q. Who said that? A. Dunn. So he asked Young when he got to Seattle if he would send a girl back here for him.

"Q. Did he say anything about what kind of a girl he wanted Young to send back to him? A. One about my size, and Young mentioned some girl, and he said yes, she would be just about the right girl.

\* \* \* \* \*

"Q. Remember anything else that was said? A. Only Dunn said it would be too late to go that night. He said he would see us the next morning, and then after he left Young told me if anybody in the houses talked to me and asked me if I knew his wife, or anything, to tell them I didn't know anything about it. \* \* \*. He said I was to bring all the money to him and he was to pay me, and that I was to tell him everything that happened in these houses.

"Q. Recall anything else? A. Nothing only he just told me how he was going to fix me, how he was going to fix my hair.

234

"Q. What did he say about that? A. First he said he thought I would make a good blond, or else a henna.

"Q. Recall anything else that was said about that? A. He said that he had been frenched so much that he wasn't much good any other way.

"Q. What did he mean by that? A. He meant that women had gone down on him so much that he wasn't much good at having intercourse.

"Q. How long did you stay in that room? A. All night, until about ten the next morning.

"Q. You stayed in this room with Young that night? A. Yes.

"Q. Occupied the same bed with him? A. Yes.

"Q. When did you leave there? A. About ten the next morning, George Edwards and Mr. Clayton came and got us."

Enid Gartner, a girl of seventeen years, and known to the record as the girl friend of Lucile Howard, testified that she went riding with "this Art once, and I went with Young and Lucile five or six times"; that she met Art and Young at the home of Lucile Howard in West Salem about 7:00 p. m. on May 12, 1930, and that the four of them went for a ride in a Reo coupe driven by Young who occupied the front seat with Lucile, while she and Art occupied the rumble seat; that they drove northerly from Salem and stopped in a grove in the vicinity of Lake Labish. As to what then transpired, she testified:

"We were just talking for a while and turned on the lights and looked around and talked, and then Lucile and Young started in their proceedings.

"Q. What do you mean by that? * * * A. Well, I saw her put her head in his lap * * *.

"Q. What was said at that time? A. Well, she just—he turned and asked me what was the matter, and I said, 'Nothing.' And he told me to be a sport,

and so did she. And I said I wouldn't do that sort of thing, so Art told me, 'Come on. Be fashionable.' I said I wouldn't do it.

\* \* \* \* \*

"Q. What do you mean by 'that sort of thing?' A. Well, what they did.

"Q. What did they do? \* \* \* A. They turned around and they, the defendant, told me to go ahead, and Art asked me to go down on him, and I said I wouldn't. She turned around and went down on Young.

"Q. Did you see that? A. She had her head in his lap.

\* \* \* \* \*

"Q. What did Mr. Young say to do? A. He told me to go ahead and do what Art asked me to, and I said I wouldn't.

"Q. What did Art ask you to do? A. Well, he asked me to go down on him.

"Q. What did you say to that? A. I said I wouldn't.

"Q. What else was said then? A. Well, just what I got through saying. Do I have to repeat it? He just told me, 'Go on. Be fashionable.' And Lucile turned around toward me and told me to be a sport. Young said that was the only way to do things, and I said I wouldn't do it.

"Q. Did Young make any remarks about your person at that time? A. No.

"Q. Was there anything said about your lips or mouth? A. This Art said my 'pretty red lips would just fit,' so far as that goes.

\* \* \* \* \*

"Q. What occurred coming back to town? A. We started out and got down the road a little ways and he (Young) was driving, and he asked me if I would fix Art up before we got back, and I said I wouldn't, so he just drove on. \* \* \* This Art wanted Young to take him to the Senator and get this Dunn to go with me, and I said I didn't care to—I would go on home; so they took me home."

Anderson's Dictionary of Law defines "sodomy" as—

"carnal copulation, by human beings with each other against nature, or with a beast. Named from the prevalence of the sin in Sodom. The infamous 'crime against nature' * * *; an offense of so dark a nature, so easily charged, and the negative so difficult to be proved, that the accusation should be clearly made out."

See, also, 4 Bl. Com., 215, and Underhill on Crim. Ev. (2d Ed.), § 360.

In order to establish the material allegations of the accusation against the defendant, the prosecution offered evidence in proof of the commission of other sexual acts between the defendant and his accomplice. This proof of other crimes was received over the objection of the defendant who contended that such evidence had no bearing on the case, and that its admission constituted error. In support of his contention he cited the case of *State v. Start,* 65 Or. 178 (132 P. 512, 46 L. R. A. (N. S.) 266). That case does not sustain the defendant's view. Start was prosecuted for the crime of sodomy, and it was there held that evidence that he had committed a like offense in the same way with other persons than the one named in the indictment was not admissible under the exception to the rule excluding testimony of other crimes which permitted such testimony in cases of illicit sexual intercourse to prove an inclination to commit the act, since that exception was limited to proof of similar crimes between the same parties.

It is said that "the nature of the evidence with respect to the actual commission of sodomy is the same as in the case of rape." 25 Am. & Eng. Ency. of Law (2d Ed.), p. 1147.

In treating of the competency of evidence in a prosecution for sexual crimes, 4 Nichols Applied Evidence, § 47, "Rape," says:

"Evidence of other sexual acts either before or after the act relied on is admissible. Evidence of similar offenses committed between the parties, both prior and subsequent to that with which defendant is charged, may be introduced after the prosecution has elected to rely on some particular act for conviction, for the purpose of showing the inclination of the parties toward each other."

To like effect is Underhill on Crim. Ev. (2d Ed.), § 415.

The case of *State v. Robinson*, 32 Or. 43 (48 P. 357), is directly in point. The defendant in that case was indicted for the crime of rape. At his trial it was urged in his behalf that the prosecution had not the right to adduce evidence tending to show more than one act of criminal intercourse between the defendant and the prosecutrix. In its opinion sustaining the ruling of the lower court, this court there said:

"As a general rule, the principal invoked is unquestioned, although there are in fact many exceptions which it is unnecessary to attempt to point out at this time, as the authorities fully sustain the competency of the evidence offered and admitted in this case, not for the purpose of proving a different offense, but to show the relation and familiarity of the parties, and as corroborative of the prosecutrix' testimony concerning the particular act relied upon for a conviction."

In support of the proposition just enunciated, many authorities are cited in that opinion.

In *State v. Putney*, 110 Or. 634 (224 P. 279), a prosecution for statutory rape, we held that the testimony of the prosecutrix that defendant told her he had been familiar with some other girl of tender years and that

"he never got her into trouble," was admissible as *res gestae,* as against the contention made by the defendant that this testimony constituted evidence of the commission of other crimes.

A leading and instructive case bearing upon the question at issue is *Barnett v. State,* 104 Ohio St. 298, (135 N. E. 647, 27 A. L. R. 351). In that case the defendant was charged with the commission of the crime of sodomy on the person of a little girl, and the court, for the purpose of showing the habitual moral degeneracy and sexual perversion of the defendant and his criminal course of lascivious conduct, and to identify the defendant as the sexual pervert who committed the crime charged in the indictment, admitted evidence of similar assaults asserted to have been committed upon other little girls by the defendant at about the time of the crime charged in the indictment. In rendering its decision in that case the court quoted from *State v. Reineke,* 89 Ohio St., 390, 391 (106 N. E. 52, L. R. A. 1915A, 138), as follows:

"It is an elementary proposition of law, both sound and humane, that a person may not be convicted of the crime charged upon a certain date by showing that, upon other dates previous or subsequent, he committed other crimes and offenses. But this rule has many exceptions in certain particular lines of cases as to prior acts."

Among the exceptions noted are the following:

"3. Where the various acts show a general scheme or system of criminal conduct.

"4. In what are known as 'sexual crimes,' such as a continuous adultery or fornication, criminal conversation, incest, and the like."

Counsel for defendant has emphatically asserted and ably argued that the evidence adduced by the state

is insufficient to warrant the conviction of the defendant. The determination of this point is decisive of the case.

A rule of evidence that has been codified as section 13-935, Oregon Code 1930, reads:

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and the corroboration is not sufficient if it merely show the commission of the crime, or the circumstances of the commission."

See the many local authorities cited in the note to this section.

The weight of the evidentiary circumstances relied on to corroborate the testimony of the accomplice is for the jury: *State v. Brown*, 113 Or. 149 (231 P. 926). In that case we said:

"Much has been written concerning the sufficiency of corroborating testimony, yet no exact rule has been established for measuring the sufficiency thereof, beyond the mere declaration that the corroborating evidence must tend to connect the defendant with the commission of the crime. Each case must depend upon its own peculiar facts. The reports contain many cases illustrating the sufficiency or insufficiency of such evidence. But the statute is plain, and it is the writer's opinion that little is gained by an effort to make plain that which is already plain. The language of the law of this state is concise and clear, and declares, in effect, that there must be testimony other than that of the accomplice or accomplices that tends to connect the accused with the commission of the crime."

In the case at bar, there is ample testimony other than that of the accomplice that tends to connect the defendant with the commission of the crime charged.

We have incorporated in the record the revolting language employed in the testimony by the principal witnesses only for the purpose of aiding the reader in obtaining a clear insight into the loathsome character and nefarious conduct of the actors of this disgusting drama. Further comment upon the testimony of the accomplice in the case, or upon that of Enid Gartner, her innocent companion, is deemed unnecessary. Suffice it to say that the testimony hereinbefore set out constitutes an abundance of proof to satisfy section 13-935 of our code as to the sufficiency of corroborative testimony to sustain the accomplice so as to justify a conviction. See the recent case of *State v. Brazell,* 126 Or. 579 (269 P. 884), where this court, speaking through Mr. Justice BELT, wrote:

"The law applicable herein has been stated many times by this court, and we see no need for restatement. State v. Brake, 99 Or. 310, 195 P. 583, and cases therein cited. In 1 R. C. L., p. 170, it is said:

" 'Where it is objected that there is no corroboratory evidence tending to connect the defendant with the commission of the offense, it has been stated that the rule of appellate courts to test the legality of the verdict is to take the strongest statement of the case against the defendant that the evidence would warrant the jury in finding if the facts were specially found.' "

A search of the evidence of record herein reveals that the chief object of the defendant in associating with his accomplice in crime was the promotion of a general scheme to induce this weak and sinful girl to enter a house of ill repute kept for the gratification of the vicious passions of lustful men. Throughout our examination and deliberation of the facts in the case, we have kept in mind that the charge that has been made against the defendant is a charge that is easy to

make, and, in the very nature of things, difficult to defend. Despite this fact, a careful examination and study of the evidence of record points to but one conclusion: That the verdict in this cause manifestly is in accordance with the weight of the evidence and with justice.

The judgment rendered by the lower court should not be disturbed. We, therefore, direct its affirmance.

CAMPBELL, J., concurs.

BEAN, C. J., and BELT, J., concur in the result.