STATE, Respondent, v. PRAY, Appellant.

(270 N. W. 512.)

(File No. 7853.   Opinion filed December 17, 1936.)

*E. B. Adams*, of Hot Springs, for Appellant.

*T. B. Thorson*, State's Atty., of Rapid City, and *Walter Conway*, Atty. Gen., for the State.

POLLEY, P. J.   Appellant was convicted of the larceny of two horses belonging to one Ralph H. Sanders; one a bay gelding branded J. E. S. on the left shoulder and one iron gray gelding branded Z on left shoulder.

Appellant moved for a new trial on the ground, among others, that his conviction was based on the uncorroborated testimony of accomplices. The motion was overruled and he appeals to this court.

It is not claimed that appellant personally took part in the larceny of the horses. The actual stealing was done by a pair of self-confessed thieves by the names of Floyd Reaman and Ed. Grueber. These parties, when charged with the theft of the horses, admitted their guilt but claimed that the stealing was a joint enterprise by themselves and appellant, and that the proceeds of the sale of the stolen horses were divided equally between themselves and appellant. Reaman and Grueber were the principal witnesses against appellant at the trial, and it was upon their testimony principally, if not wholly, that the conviction is based.

Section 4882, R. C. 1919, provides as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

"This does not mean that the evidence aside from the testimony of the accomplice must be sufficient alone to warrant a conviction; neither does it require direct evidence. Circumstances alone may amount to a sufficient corroboration, but in either case the corroborating evidence must do more than merely show the commission of the offense." State v. Odle, 45 S. D. 575, 189 N. W. 515, 516.

Appellant lived in Rapid City, but had a ranch near the mouth of Spring Creek on the Cheyenne river, 35 miles southeast of Rapid City. The witness Reaman lived in the neighborhood of Rockerville, some 15 miles southwest of Rapid City and approximately 40 miles from appellant's ranch. Appellant had met the witness and bought some wood from him in January 1934, but their acquaintance prior to the transaction involved in this action was slight. About the 5th day of March, 1934, they had a conversation in which Reaman told appellant about some horses that were running on the range in his neighborhood. He said there were seven head of the horses—two black mares, two brown geldings, a dark gelding with a few gray hairs, and a dapple gray. Reaman testified that he told appellant of seeing these horses out on the range and that they were near his place. He said that appellant talked as though the horses might be his; that he had lost

some horses out there, a couple or three years ago. Reaman further testified that appellant suggested to him that he would like to see the horses; and within a day or two thereafter the witness, together with appellant and appellant's son, went out to see the horses. They went out into the neighborhood of witness' residence but were unable to find any of the horses. Appellant then asked the witness if he could not round up the horses and have them at some place where appellant could see them. This the witness agreed to do. He further testified: In two or three days, he rounded them up, putting four of them inside a pasture and the rest were left outside. After he rounded them up he went down and saw Mr. Pray. He told Pray he had rounded up the horses that he wanted to see. Pray's son then drove them out to see the horses. All three of them went and Pray and his son decided that the horses were theirs on account of looking similar to a stallion they had. He further testified: "I could not see any brands on them from where I was. The horses had not shed their winter coats and on the four in the pasture, we couldn't notice the brands. Mr. Pray claimed the horses after looking them over, and then arranged with me to deliver them to him at his ranch. I was to receive $10 for delivering these horses at Pray's ranch. That evening before I went back home, Pray gave me $5."

Up to this point nothing had been said about taking any horses except appellant's. Reaman does not deny that appellant told him that he did not want any horses that did not bear his brand, and there seems to be nothing unusual or out of the ordinary about the transaction.

Witness continued: "That same evening, I went up town and talked to Ed. Grueber concerning these horses. Mr. Grueber came with me out to my home that night. The next day we went down to Mr. Castle's and borrowed two saddle horses, and then two days later, Ed. Grueber and I rounded up the horses. We found five, among them the brown gelding, the bay gelding and a dark gray. The dapple gray, and the saddle horse belonged to Grover. I did not see anything of the two black mares nor was I able to find them. I found the horses near by my place. After locating the five horses, we drove four of them away, consisting of the brown gelding, bay gelding, the dark gray and the dapple gray.

None of these horses had been claimed by appellant, nor had appellant been informed that the witness intended to steal any of them. We drove these horses to Hermosa that day and next day drove them to Dick Pray's ranch where we arrived about four-thirty in the afternoon. No one was at home, but Pray had given me a key so we could get in the house when we arrived there with the horses. We stayed there all night and next forenoon I called Mr. Pray on the telephone, and as a result of the telephone call he came out to the ranch that evening. The next morning we went out to look at the horses. I told Pray that I had brought four; that I couldn't get the other two. We were told by Pray not to say anything about the horses in front of his brother-in-law. The horses were turned out in Pray's pasture and Grueber and I came to Rapid City with Pray. We went to Pray's house and he gave us some money." This, Pray positively denied. "Three or four days later we returned to the ranch, going down with Mr. Pray in his truck. We rounded up the four head of horses, and put them in the corral. A horse-buyer, Eddie Vaughn, arrived that evening. I was told on the way down to the ranch that he was coming. Grueber showed Vaughn the horses and in the presence of Pray and myself, Grueber priced the horses to Vaughn and he asked $160 for them. We did not sell the horses that night and Vaughn went home. He returned the next afternoon. Grueber assumed ownership of, and affected a sale to Vaughn for $120 for the four horses. Vaughn paid the money in bills and Grueber signed some sort of memorandum at the time." Pray took no part in this transaction but Reaman and Grueber testified that Grueber divided the money equally between the three. Pray sold Vaughn a sorrel mare out of his pasture and the five head of horses were delivered to Vaughn at Scenic that afternoon. Pray and Reaman assisted Grueber in getting the five head of horses across the river on the road to Scenic. Reaman and Pray then returned to Pray's ranch and Grueber took the horses on to Scenic where he turned them over to Vaughn. Reaman testified that he took his share of the money received for the horses, knowing that "neither Grueber, Pray nor himself owned the horses."

The witness Grueber testified: "I live in Rapid City and I am acquainted with Floyd Reaman. During the month of March,

1934, I agreed to and went out with Reaman to help round up some horses. We went over the hills along the road. We found five head: one brown horse, one bay horse, one iron-gray, one blue gray and one bay saddle horse. There was supposed to be a pair of black mares but we did not find them. Of the five horses we found we drove away four of them: the bay, the brown, the iron-gray and the blue gray. I couldn't tell whether they were branded or not. They were all geldings. We drove these four horses to Pray's ranch and put them in a corral. There was no one at the ranch when we arrived. The next morning Reaman had a neighbor take him to Creston from which place he telephoned to Pray and Pray and his brother-in-law came out to the ranch that evening. They did not look at the horses that evening and we all stayed there all night. No conversation took place between Reaman and Pray with reference to the horses. Next morning we looked at the horses but nothing was said about the ownership at that time. We didn't look for any brands. After we looked at the horses we came back to Rapid City. We rode back with Pray and his brother-in-law. About three or four days later we all went back to the ranch in Pray's truck. No conversation took place relative to the horses except that Pray said a horse-buyer was coming out. We arrived there in the afternoon and that same afternoon Ed. Vaughn, the horse-buyer arrived. Prior to Vaughn's arrival I had a conversation with Pray concerning the brand of the horses. He and I were alone. Pray said to me, if we sell these horses we will split the money 'three ways.' He said not to say the horses belonged to him. Later in the evening Vaughn appeared. He looked at the horses and I priced them to him. I priced the horses at $160.00 but did not make a sale that night. Vaughn went home and I stayed at Pray's place that night. Next morning Vaughn returned but before he arrived Pray told me to go ahead and sell the horses and get what I could for them. He said I should say they were not his horses; that they came from Buffalo Gap. The next morning I effected the sale of the horses for $120.00. We examined the horses for brands. We could tell the brand on one horse but not on the others. The brand on one horse was J E S. The other horses wore some brand but we couldn't decipher them. Vaughn paid me $120.00 and I signed the

bill of sale or memorandum. After the sale Vaughn left and we went into the house and divided the money. I gave Pray $40.00, Reaman $40.00 and kept $40.00 for myself. Next morning I went back to Rapid City with Pray. The first time I knew about there being any horses to round up was the night I went out there with Reaman. We found the horses along the road, and the five horses were close together and no other horses around. I had never seen these horses before but Reaman told me they were the ones that we were going to take. We didn't stop to examine the brands and I didn't know whose horses they were. Up to that time I hadn't met Mr. Pray. The first time I met him was the night he came down to the ranch after Reaman called him. I had a conversation with him at that time. He said not to say anything about the horses before his brother-in-law. This conversation took place outside the house. I had never met Pray before but he told me to sell the horses and split the money three ways. I agreed to do it because the horses didn't belong to me. I thought I was selling them for him. I did not know they were not Pray's horses. He told me, however, not to tell his brother-in-law anything about the horses. He did not fix the price, I offered them for $160.00. There were other horses at the ranch belonging to Pray. He offered to sell five of them but sold only one to the horse-buyer, but the other horses were there for sale. He said that we would split the money three ways. I didn't know they were stolen and I didn't think it was strange that Pray would split the money three ways on his own horses. I thought it was all right to sell his own horses and to give me and my partner as much as he got out of it. He didn't offer me the same on the other horses he had to sell. I thought it was all right for me to sign the bill of sale of the horses that I didn't own. When I divided the money I said: 'Here is $40.00 for you Reaman and here is $40.00 for you Dick Pray and that is all that was said.' There was no conversation between Reaman, Pray and me about the horses when I first saw Pray after he came from Rapid City. He just glanced at the horses in the morning but said nothing about them, and on the way back to Rapid City there was nothing said about the horses. He didn't say they were not his horses and he never told me that they were his horses."

After giving the foregoing testimony Grueber for some reason appears to have felt that his story he had told did not sound reasonable, so he changed it in part as follows: The prosecuting attorney put this question to him: "Now, Grueber, in answer to counsel's question on cross-examination, you said when you sold these horses for Pray you thought they were Pray's horses; that isn't the truth, is it?" "No, it is not." "Q. In fact when he suggested to you that you handle the sale of the horses you knew they were stolen horses didn't you?" "I thought they were." "Q. You thought they were stolen?" "Yes, sir." "Q. Isn't it a fact you knew they were stolen when you were given one-third of the proceeds of the sale price?" "I figured they were, yes sir." "Q. When was it in point of time that you first had reason to believe they were not Pray's horses?" "When Pray asked me to sell them." "Q. Why did you tell me on cross-examination that at the time you sold these horses you thought they were Pray's?" "Because these were supposed to be the horses—these horses we fetched down were supposed to be Pray's horses."

Appellant testified that after having failed to find any of the horses on their first trip to Rockerville, he asked Reaman if he would gather the horses and have them some place where appellant could see them. Reaman said he would, and in a very few days reported to appellant that he had gathered some horses that were branded R-R. Appellant said his son drove him and Reaman out again; that they found three black mares and a black or brown gelding. Appellant claimed the three black mares as his. One of them was a long yearling or short two year old that was suckling one of the mares and was not branded. Neither of these mares were taken to Pray's ranch by Reaman and Grueber.

Appellant then asked Reaman what he would take to deliver the horses to him at his ranch, offering Reaman $10 to do so. To this offer Reaman replied: "Alright, I will have them down there day after tomorrow evening." Reaman said appellant paid him $5 in advance. This appellant denied and said he did not pay him anything at that time, but told Reaman, "I would meet him at the ranch and pay him." Appellant further testified that he went down to the ranch at the time fixed by Reaman, to meet him, but that Reaman was not there and did not come that night nor

the next day, and that evening appellant went back to Rapid City. In a day or two he received a telephone call from Reaman, saying that he had arrived at the ranch with the horses, and that he (appellant) went down to the ranch that evening.

"The next morning we went out to see the horses. When we looked at them he had two bay horses and two grays that I had never seen before. I said: 'Where in hell is my mares?' He said: 'They got away and I couldn't find them.' I asked him whose horses these were, and he said they belonged to Grueber; and I said: 'What is he doing with them here?' Reaman said: 'He knows the horse-buyer at Scenic; he is taking them over to sell them.'" This was the first time appellant had ever seen or heard of Grueber; and Reaman did not dispute that this conversation took place just as above set out.

"Grueber asked if he could leave the horses there for a few days until they could get hold of the horse buyer. I gave my consent to that and that was all that was said about it, and I never cautioned them not to say anything about the horses in the presence of my brother-in-law. 'There wasn't a word said about it in any shape or form.'

"I was acquainted with Vaughn, the horse-buyer, and had sold him some horses before. He stopped at my house in Rapid City and asked me if I would sell him (Vaughn) some colts I had. Appellant told him the colts were for sale. Vaughn said he would meet appellant at his ranch 'the day after tomorrow,' and he would try to buy them." Appellant met Grueber and Reaman in Rapid City and told them about seeing Vaughn and that he (appellant) was going to sell some horses he had, and Grueber said he would like to go to the ranch along with appellant. On the day fixed by Vaughn, appellant in company with Reaman and Grueber went to appellant's ranch, reaching there about 3 o'clock in the afternoon. Vaughn came that night and wanted to know where the horses were. "I told him I wouldn't round them up that night; it was storming too badly and he went home but returned in the morning." "The next morning I sold him a sorrel horse I had in the pasture, and Grueber sold him the four horses he and Reaman had brought there." These horses, including the one sold by appellant, were all to be delivered at Scenic. Appel-

lant and Reaman helped Grueber drive the horses across the bridge until they got to the lane and Grueber then drove them to Scenic.

When the plot to steal these horses was formed, the record does not disclose. There is nothing in the testimony of Reaman up to the time the horses were delivered at appellant's ranch, to indicate that appellant knew of any intent by Reaman to take any horses that did not belong to appellant. In fact, appellant cautioned Reaman not to take any horses that were not branded R-R. The first act by appellant as claimed by Reaman that would cast any suspicion on appellant was telling Reaman not to say anything about the horses "in front of his brother-in-law," and this statement is not corroborated by any evidence in the record. After Reaman told appellant that the horses belonged to Grueber and that he had brought them over to take them to Scenic, appellant paid no further attention to them. He took no part in the sale of the horses to Vaughn. Reaman testified that he heard appellant tell Grueber in the morning before the horses were sold to "talk up and make the best bargan he could." But this statement is not corroborated by any evidence in the record. Appellant denied making any such remark, and appellant flatly denied that he ever received any part of the money that was paid for the horses or ever had any arrangement by which he expected to receive any part of it and there is no corroboration of the witness' statement. Appellant denied that he paid Reaman any part of the money he was to have for taking appellant's horses to the ranch, either at the time he employed Reaman to take the horses to the ranch or afterwards, and the witness' statement is not corroborated by any evidence in the record.

As corroboration of the testimony of Reaman and Grueber the Attorney General says: "Other witnesses, not accomplices, testified to seeing a band of horses including the stolen animals ranging near defendant's ranch and were put in the corral." This statement is not supported by any evidence in the record and if it were true it does not in any manner tend to connect the appellant with the larceny of the horses. None of these horses ever ranged within 40 miles of defendant's ranch. They ranged near Reaman's home 2 miles south of Rockerville, while appellant's ranch is on the Cheyenne river 40 miles east of Rockerville; and whether the

Attorney General has reference to the corral on Castle's place near Rockerville, or the corral on appellant's ranch on the Cheyenne, there is no way of knowing.

Again the Attorney General says: "The defendant, together with the accomplices Grueber and Reaman, were at his ranch on the 18th or 19th of March, when Ed Vaughn, the horse-buyer arrived." This is true, but it does not tend to connect appellant with the larceny of the stolen horses or tend to show that appellant knew that a larceny had been committed. The evidence shows that appellant had an appointment with Vaughn to meet him at the ranch at that particular time. Grueber had left the solen horses at appellant's ranch in order that he might deal with Vaughn when he returned to Scenic. This does not show a guilty intent on the part of appellant, nor does it in anywise tend to connect appellant with the larceny of the horses.

Again respondent says: "That Vaughn talked to Grueber and Pray and finally bought the four horses." This statement is not true, and is not supported by any evidence in the record. Vaughn bought the solen horses from Grueber, and appellant took no part in the transaction, and was not present when the sale was made; Vaughn also bought a sorrel mare from appellant but Grueber took no part in that transaction and claimed no interest in the mare, nor did he receive any part of the money paid for her.

It is next said by respondent that Carl Hanson testified that he took Floyd Reaman to the town of Creston so that Reaman could "phone in to Dick Pray." That Hanson brought Reaman back, and he saw Mr. Pray at his ranch the next morning. This may all be true, but it in no manner tends to connect appellant with the larceny of the stolen horses.

Again respondent says: "That recently stolen property—the two horses in question—was in the possession of defendant on his ranch." This statement is not true. The horses were taken to appellant's ranch without his knowledge or consent, and he never had the horses in his possession or exercised any control over them. There is no evidence showing that appellant knew at the time the horses were taken to his ranch that they were stolen, and the mere fact that he permitted the horses to remain at his ranch

until the return of the horse buyer does not tend to connect him with the theft of the horses.

And as the climax, respondent says: "That the defendant, Grueber and Reaman, were together before and after the horses were stolen." This statement is wholly untrue. The undisputed evidence by both appellant and Grueber affirmatively shows that appellant never saw or heard of Grueber until after he had stolen the horses in the Hills near Rockerville and had driven them to appellant's ranch 40 miles from where he stole them.

██ It is true that a great deal of the testimony of Grueber and Reaman is corroborated by testimony of disinterested witnesses, and by surrounding circumstances. In fact appellant and Reaman agree in many respects on what occurred prior to the theft of the horses, but such matters in no way connect appellant with the crime, and the circumstances are more consistent with the innocence of appellant than with his guilt. It must be borne in mind that the corroboration required by section 4882 must be "such other evidence as tends to connect the defendant with the commission of the offense." Upon this phase of the case the court charged the jury as follows:

"You will note, gentlemen, that the corroboration must be corroboration of the testimony which tends to connect the defendant with the commission of the offense. Mere corroboration of the fact that an offense was committed is not, in itself, sufficient, but there must be corroboration of the accomplice's testimony tending to show that the defendant was connected with the commission of that offense."

While this is not a very clear statement, it is a correct statement of the law and is the law of the case. Mere corroboration of trivialities or immaterial matter is not sufficient. It must corroborate the testimony of the accomplice that "tends to connect the defendant with the commission of the offense." If the testimony of Reaman and Grueber were eliminated from the record in this case, there is no evidence left that tends to connect the defendant with the offense. It is worthy of note that neither Reaman nor Grueber disputed any of appellant's testimony.

It must also be borne in mind that the witnesses Reaman and Grueber are self-confessed liars, and self-confessed thieves. They

had both pleaded guilty to the theft of the Sanders' horses, but neither of them had been sentenced at the time of the trial; and it is much more likely that they testified as they did for the reward they had been promised, or expected, at the hands of the court than because the facts were as they claimed them to be. We do not think the evidence is sufficient to sustain the conviction of defendant.

The judgment and order appealed from are reversed.

CAMPBELL, ROBERTS, and WARREN, JJ., concur in reversal.

RUDOLPH, J. (dissenting). Independent of the testimony of the alleged accomplices, Reaman and Grueber, the following facts are established by the testimony of other witnesses:

The defendant was seen in the company of Reaman in the immediate vicinity of the place where the horses were kept a few days before the larceny occurred. (Testimony of Roy Castle.)

A few days after the larceny, the stolen horses were on the ranch belong to the defendant some 40 miles away from the place the larceny occurred. (Testimony of Ed Vaughn.)

When the stolen horses were brought to the ranch of the defendant, Reaman immediately got in contact with the defendant by telephone. (Testimony of Carl Hanson.)

The defendant made arrangements with the horse buyer to be at his ranch at the very time the stolen horses were there and, as a result of this visit to the defendant's ranch, the horse buyer bought the stolen horses. The purchase of the horses by the horse buyer was made on defendant's ranch, and defendant was there at the time. (Testimony of Ed Vaughn.)

The defendant and Reaman were together after the larceny occurred, and after the horses were sold. (Testimony of O. G. Anderson.)

I believe the above testimony is sufficient corroboration of the testimony of the alleged accomplices. The rule as to corroborating testimony as established in this state is well stated in State v. Walsh, 25 S. D. 30, 31, 125 N. W. 295, 297.

"While it is necessary that the evidence of an accomplice be corroborated, yet the degree of evidence which shall be deemed

sufficient to corroborate the testimony of an accomplice is for the determination of the jury. The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice."

See, also, State v. Kruse, 24 S. D. 174, 123 N. W. 71; State v. Hicks, 6 S. D. 325, 60 N. W. 66; State v. Drepeau, 45 S. D. 507, 189 N. W. 305, 306. In the last-cited case this court quoted with approval, the following:

" 'The evidence adduced to corroborate the accomplice need not be strong, absolutely convincing, or sufficient in itself, to support a verdict of guilty, nor even equivalent to the swearing of one credible witness; any corroborative evidence legitimately tending to connect defendant with the commission of the crime may be sufficient to warrant a conviction, although, standing by itself, it would be only slight proof of defendant's guilt, and entitled to but little consideration, and even though it is not wholly inconsistent with the innocence of the defendant'—citing cases.

"It is also held that: 'The fact that at or about the time of the commission of the offense with which defendant is charged he and the accomplice were together in apparent intimacy in the neighborhood of the place where the crime was committed may sufficiently connect the defendant with the commission of the crime to furnish the necessary corroboration of the accomplice.' Id. 708 (1446)."

I believe the conviction should be sustained.