Argued October 18, 1938; reversed January 17, 1939

# STATE *v.* REYNOLDS ET AL.

(86 P. (2d) 413)

*Frank B. Reid* and *C. N. Johnston,* both of Eugene (Charles W. Robison, of Portland, on the brief), for appellant.

*L. L. Ray,* District Attorney, of Eugene, and *Ralph E. Moody,* Special Prosecutor, of Salem, for the State.

LUSK, J. The defendant and appellant, Hugh Reynolds, who will hereinafter be referred to as the defendant, has appealed from a judgment of conviction in a criminal case. The indictment on which he was tried contains three counts. The first count accuses him and Vern Bailey, Ray W. Blaine and V. D. McCauley of the crime of conspiracy to commit a felony; the second of the crime of riot; and the third of the crime of breaking the glass in a building not his own, to wit, a building in the city of Eugene, Lane county, Oregon, in a part of which the barber shop known as the City Barber Shop was then located. All three charges grow out of the same alleged transaction. The defendant was tried separately. The court directed a verdict of not guilty on the first two counts of the indictment and the jury returned a verdict of guilty on the third.

On this appeal there are five assignments of error. Three of these complain of rulings of the court below in the admission of evidence over the defendant's objection; another, of the court's denial of the defend-

ant's motion for an instructed verdict of not guilty of the crime charged in the third count, based on the ground that there was no evidence other than that of accomplices tending to connect the defendant with the commission of the crime; and the fifth assignment of error is predicated on the refusal of the court to grant a motion for a new trial on the ground of newly discovered evidence.

The question whether the defendant was entitled to an instructed verdict on the third count will be first considered, and for that purpose we set forth the substance of the testimony in the record upon which the state relies to sustain the conviction.

It appears that from July, 1937, until November 15, 1937, the City Barber Shop in Eugene, a non-union shop, was picketed by the Journeymen Barber's Union for the reason that it had continued to charge 35 cents for a haircut after most of the other shops had raised the price to 50 cents. This was a cause of dissatisfaction not only to the union but also to the proprietors of shops maintaining the higher prices, and it was the contention of the state, which the evidence tends to support, that, mere picketing having proved ineffective, it was determined to resort to what is called in the record "direct action", and that to that end, at the suggestion of the Boss Barbers' (the Employers') Association, three members of the Teamsters' Union, Newland, Carson and Moore, were hired by certain labor union officials, including the defendant Reynolds, to break the windows of the City Barber Shop, and that these men were compensated for their services with money contributed by members of the Boss Barbers' Association.

Newland, Carson and Moore had theretofore been engaged in similar crimes of violence incident to labor

controversies, and Moore had previously served a term in the penitentiary. They were law violators for hire. They testified in substance that on the morning of November 15, 1937, at the direction of Clarence Adams, a member of the Teamsters' and Truck Drivers' union and manager of the hiring hall for that union at Portland, they left Portland for Eugene by automobile. On their arrival at Eugene sometime between the hours of 4:00 and 5:00 p. m. they sought out the Labor Temple, and there, in the office of the Central Labor Council, they met the defendant Reynolds, who was secretary of the Teamsters' Union and likewise secretary of the Central Labor Council at Eugene. They informed Reynolds that they had come from Portland with reference to breaking some windows and had been told to see either the teamsters or the barbers, and had concluded to see the teamsters as they seemed to know about the affair. Reynolds stated that the windows had been broken previously, "but a good job was not done on it", and told them what windows were to be broken and pointed out to them from his office a barber shop across the street (not the City Barber Shop), the windows of which had previously been broken. While these three men were closeted with Reynolds he had a conversation over the telephone concerning which the following is taken from the testimony of Newland:

"Q While you were there did the defendant Reynolds have any telephone conversation?

"A Yes, I overheard a conversation between he and the Consolidated Freight Lines.

"Q And what was the nature of that conversation?

"A It seemed like somebody belonging to his local had been fired from the job for incompetency and I, as I gathered, that he had called the Consolidated Freight Line and told them that—

"COUNSEL FOR THE DEFENDANT: Just the conversation, Mr. Newland, which you heard and not what you gathered.

"A Why, he said over the telephone it was funny if a man had worked for them for four years to find him incompetent and he said they had better put him back to work or he would tie up their system.

"MR. RAY: Q After he had hung up did he say anything to you boys about who he was talking with?

"A He didn't mention any names, no.

"Q Now, this telephone conversation occurred when you were in what office?

"A In the larger office. After we got into the main office, when Mr. Reynolds took us into his private office, the larger one."

Sometime after this telephone conversation Newland, Carson and Moore went from Reynolds' private office to an adjoining office, and while there the defendant, Vern Bailey, came in. Bailey was business agent of the Teamsters' Union at Eugene. These five men engaged in a discussion concerning the pay for the job, and the sum of $60 was agreed on. Later, Reynolds being then out of the room, the defendant Blaine, who was delegate to the Eugene Central Labor Council from the Barbers' Union, joined them. Blaine reiterated Reynolds' statement that they had previously hired someone to break those windows and they didn't do a very good job of it, and "he wanted us to be sure of doing a good job of breaking them". Blaine left; Bailey paid $60 to Newland, Carson and Moore, and about 7 or 8 o'clock in the evening they departed from the Labor Temple, Bailey accompanying them for the purpose of showing them the location of the City Barber Shop and a convenient route out of the city after they should have accomplished their task. The three accomplices then proceeded in their automobile to a

gravel plant where they obtained some rocks, returned to the city, cast the rocks through the windows of the City Barber Shop, and sped away to the south. They went to San Francisco, spent their money, and on the night of the 18th of November returned to Eugene when they again broke the windows of the City Barber Shop. Their reason for this repetition of vandalism, as stated by Newland, was: "We figured $20.00 apiece was a considerable amount for breaking the windows, and, as they really wanted a good job done and the fact that we broke them early in the evening around 9:30 or 10 the day before, we figured by breaking them again we would give them good measure for their money."

The foregoing statement of the part taken by the three self-confessed malefactors in the crime is a condensation of their stories told on the witness stand with a wealth of detail. It will suffice, however, for present purposes.

V. D. McCauley was a co-defendant. The charge against him was dismissed at the trial on motion of the district attorney, and McCauley took the stand as a witness for the state and gave testimony of the following purport:

He was secretary of the Eugene Journeymen Barbers' Union. As such he collected money from the Boss Barbers to defray the cost of the joint enterprises of the Boss Barbers and the union against those employers whose practices did not meet with their approval. He kept a record of receipts and disbursements covering the period from July 2nd to November 29th, 1937. The receipts amounted to $634.35. Until October 11th the fund was devoted solely to picketing expenses, but thereafter it was used also for direct action, and in-

cluded in the expenditure was an item of $60 paid to Blaine on November 15th under circumstances which will be related in McCauley's own words. He testified that about a week before November 15th he and the defendant Blaine went to see Reynolds in his office at the Labor Temple, and McCauley informed Reynolds that the Boss Barbers were not satisfied with the results of the picketing at the City Barber Shop and asked him if he would get some outside men for direct action. Reynolds said: "I don't handle things like that. You might speak to Mr. Bailey. He might know something about it." Bailey was present. Reynolds then retired to his inner office and McCauley had a conversation with Bailey. On the evening of November 15th Blaine called on McCauley at his residence and the following took place as related in McCauley's testimony:

"He (Blaine) said he had just come from Mr. Reynolds' office and there was three tough looking guys down there that looked like they would do a good job, but they wanted $20.00 apiece. That would be $60.00. I investigated the pocketbook that I was keeping the boys' money in and it contained $25.00. I said 'I don't have $60.00 for that. I don't know how I can raise it.' So we figured out that there was enough in the treasury of the local I could write a check for $35.00 and have held that until I could collect enough money from the bosses to cover it. So I gave him $25.00 and the $35.00 check, and took him with my wife down to the corner of 11th and Oak. My wife and I went over to a potluck dinner, and what he did with the money and the check from then on I don't know."

The check for $35 referred to in the foregoing testimony was made payable to the Central Labor Council and was drawn on the account of the Barbers' Union. McCauley instructed Blaine to have the check held up by Reynolds until he could collect the money and take

it up. Following that McCauley collected the money, and on Tuesday, November 29th, got the check back from Reynolds at the Labor Temple and gave him the money to cover it.

All of the foregoing testimony was given by accomplices.

We will now set forth the evidence coming from non-accomplice sources, which is pointed to by the state as supplying the corroboration requisite under the statute.

Floyd Hall, local agent at Eugene for the Consolidated Freight Lines, testified that on the afternoon of November 15th, some time after 3 o'clock, he talked on the telephone to the defendant, Reynolds, and that in this conversation Reynolds demanded that a man named Stump, a truck driver for Hall's company who had been taken off that work and reduced to the status of "an extra man swamping", be restored to his job of truck driving, and threatened to "tie us up" if his demands were not complied with. Hall further testified that he saw Reynolds in his office about the matter the same afternoon following the telephone conversation and agreed to reinstate Stump in his former job. He said that he fixed the date by a note he made in his permanent time book and a long distance telephone call to the company's division superintendent that night in which he reported his action.

The defendant, Reynolds, was not questioned by his counsel about this telephone conversation nor did he refer to it in his testimony.

The accomplices, Newland, Carson and Moore testified that when they talked to Reynolds he showed them a .22 target pistol which he wore on his shoulder in a holster. When the officers arrested Reynolds on Feb-

ruary 9, 1938, at his home they saw a .22 automatic in a holster lying on a table in Reynolds' room.

The three accomplices further testified that a middle-aged woman was working in Reynolds' office when they called there on November 15th. Vida Dillon, not an accomplice, testified that she was on duty there that day and, according to the state's brief, "the jury had an opportunity to observe that she was a middle-aged woman". There is no evidence in the record, however, as to the age of Vida Dillon.

There was independent evidence as to the existence across the street from the Labor Temple of the non-union barber shop concerning which Newland, Carson and Moore testified, as related above, and that the window of that shop was broken in October, 1937.

Newland, Carson and Moore testified that they discussed with Reynolds a picture of persons attending a labor convention which hung on the wall of the defendant's office, and independent evidence shows that there was such a picture on the wall.

The appellant admitted that he was in Eugene on November 15th and in his office from 5:15 to 5:30 or 5:45 of that day.

The accomplices, Newland, Carson and Moore, testified that the defendant showed them newspaper clippings about himself, and, according to the state's brief, there had been newspaper articles concerning the defendant. We have been unable to find any evidence, other than that of the accomplices, regarding such newspaper articles.

Other facts disclosed by the evidence, which are pointed to by the state as corroboratory in their nature, are the following:

On the 10th of November, 1937, the defendant attended a meeting of the Joint Council of the Teamsters' Union in Portland. This was shown by independent testimony and also by the testimony of an accomplice, Clarence Adams. Adams testified that he believed he saw Reynolds at the meeting and thought he talked to him before the meeting, but was not positive about that. He also swore that Vern Bailey attended the meeting. The Joint Council, according to the undisputed evidence, is composed of delegates from various local units of the International Teamsters' Union whose meetings are held to discuss problems affecting the members.

The officers took from the person of the defendant at the time of his arrest on February 9, 1938, a small black book containing a slip of paper on which there appeared in the defendant's handwriting the following memorandum: "Ernest Carson, John Newland, Cecil Moore. From Dick Johnson." Reynolds explained to the officers that he had had a conversation with Johnson, a newspaper reporter in Eugene, about those names and had written them down and put Johnson's name under them.

At a meeting of the City Council of Eugene on November 16, 1937, the defendant made the statement that the City Barber Shop was picketed because the men were paid only $15 or $16 a week and he wanted to raise the scale to $20 a week—the union wage scale. This testimony was given by A. W. Brumwell, the proprietor of the shop.

The witness, Vida Dillon, testified to a night deposit made by her for Reynolds on the evening of November 15th, thus showing, as the state argues, that Reynolds had money available for the cashing of the check which

the accomplice, McCauley, testified he gave to the accomplice, Blaine, to give to Reynolds; and, further, McCauley's records, which were received in evidence and to which reference has been made, supported his testimony concerning the disbursement of $60 on November 15th in connection with the alleged crime. His records also showed that part of the money was collected after November 15th, and this, it is said, corroborates his testimony that the check sent to Reynolds was held until the collections were made.

H. H. Pomeroy, an employee of the National Board of Fire Underwriters, testified that on the evening of February 9, 1938, at Dallas, Oregon, he saw the defendant, while in custody, in the presence of Newland and Carson, and in answer to the question what if anything the defendant said at that time as to whether he knew those men answered: "He said that he may have seen them, that it was possible they could have been in his office here in Eugene on November 15 but that he didn't remember." A. K. Lumsden, an officer of the Oregon state police, who was present on the same occasion, testified that Reynolds said at that time: "They may have been here on the 15th. He didn't remember of seeing them." These witnesses also declared that Reynolds stated that he did not know the accomplices.

Section 13-935, Oregon Code 1930, reads as follows:

"A conviction can not be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and the corroboration is not sufficient if it merely show the commission of the crime, or the circumstances of the commission."

The question for decision is whether there is "any other" evidence than that of the accomplices "which

tends to connect the defendant with the commission of the crime". If there is not the judgment must be reversed.

■ The statute was construed in *State v. Brake*, 99 Or. 310, 313, 195 P. 583, from which we quote:

"The statute uses precise language. It is not necessary that there shall be corroborating evidence concerning every material fact as to which the accomplice testified, and it is not necessary that the whole case shall be proved outside the testimony of the accomplice; for, if the statute contained such a requirement, accomplice testimony could never avail anything except as cumulative evidence. Our statute in plain words permits a conviction '*upon* the testimony of an accomplice'; with the limitation, however, upon such permission, that the accomplice shall be corroborated 'by such other evidence as tends to connect' the defendant with the commission of the crime. The language of the statute is 'other evidence'; and, hence, the corroborative evidence must be independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect, the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant *must be independent of any testimony of the accomplice.* The corroborative evidence must *of its own force, independently of the accomplice testimony,* tend to connect the defendant with the commission of the crime." (Italics supplied.)

This rule as to the character of evidence required by the statute, thus clearly and fully expounded by Mr. Justice HARRIS, has been stated and applied in many other Oregon decisions, both before and since *State v. Brake*, supra. *State v. Odell*, 8 Or. 30; *State v. Townsend*, 19 Or. 213, 23 P. 968; *State v. Jarvis*, 18 Or. 360, 23 P. 251; *State v. Scott*, 28 Or. 331, 337, 42 P. 1; *State v. Kelliher*, 49 Or. 77, 88 P. 867; *State v. Wong Si Sam*,

63 Or. 266, 275, 127 P. 683; *State v. Turnbow,* 99 Or. 270, 279, 193 P. 485, 195 P. 569, in which Mr. Justice BROWN reviewed the previous holdings of the court; *State v. Brown,* 113 Or. 149, 155, 231 P. 926; *State v. Lil Tranchell,* 119 Or. 329, 331, 249 P. 367; *State v. Haynes,* 120 Or. 573, 578, 253 P. 7; *State ex rel. Dickerson v. Tokstad,* 139 Or. 63, 67, 8 P. (2d) 86; *State v. Young,* 140 Or. 288, 239, 13 P. (2d) 604.

In *State v. Scott,* supra, the court quoted (28 Or. 337) the following from Roscoe's Criminal Evidence (13th Ed.) 110:

"What appears to be required is that there shall be some fact deposed to independently altogether of the evidence of the accomplice, which, *taken by itself,* leads to the inference, not only that a crime has been committed, but that the prisoner is implicated in it." (Italics supplied).

In 1 R. C. L. 169, § 15, Accomplices, it is said in a discussion of statutory requirements similar to ours:

"Under the above rule, the evidence relied upon for corroboration must, independently and without the aid of the testimony of the accomplice, tend to connect the defendant with the commission of the crime. Testimony which tends to make the connection *only when supplemented by certain testimony of the accomplice* does not satisfy the law. It makes no difference how thorough the corroboration of the accomplice may be in regard to facts related by him, yet unless there is some proof, independent of his testimony, tending to connect the accused with the commission of the crime, the corroboration is not sufficient." (Italics supplied).

An analogous case, illustrating the application of the rule is *State v. Brown,* 146 Iowa 113, 124 N. W. 899.

 Further, as the foregoing authorities show, the corroborative evidence need not be direct evidence, but

the statute is satisfied even though the evidence is entirely circumstantial. The corroboration need not be of itself adequate to support a conviction, but it is sufficient to meet the requirements of the statute if it fairly and legitimately tends to connect the defendant with the commission of the crime. "Any corroborative evidence legitimately tending to connect a defendant with the commission of the crime may be sufficient to warrant a conviction, although standing by itself it would be only slight proof of defendant's guilt and entitled to but little consideration, and even though it is not wholly inconsistent with the innocence of the defendant. On the other hand, evidence which merely raises a suspicion that defendant is the guilty party is not sufficiently corroborative of the testimony of an accomplice to warrant a conviction, nor will uncertain or equivocal corroboration suffice." 16 C. J., Criminal Law 712, § 1457.

The witness, Adams, who testified to sending Newland, Carson and Moore to Eugene, was an accomplice, and so, of course, were Newland, Carson and Moore, and McCauley, who testified to furnishing the money to pay the perpetrators of the crime. The corroborative evidence, therefore, must come from some other source than any of these five men.

The state contends that the evidence of Hall, the manager of the Consolidated Freight Lines in Eugene, to the effect that he engaged in the telephone conversation with the defendant on the afternoon of November 15, 1937, which Newland, Carson and Moore swore that they heard, constitutes such evidence. It is possible that had there been independent evidence that these three men were with Reynolds in his office at that time—it being the afternoon of the same day on

which the windows were broken, and they having no occasion to visit the defendant on legitimate business —the case would come within the rule laid down in *State v. Brake,* supra, and 16 C. J. 707, § 1445, Criminal Law, and applied in *State v. Townsend,* 19 Or. 213, 23 P. 968, that "intimate association with the accomplice at or about the time of the commission of the crime and in the neighborhood of the place where the crime was committed may sometimes be sufficient". Indeed, it is the position of the state, as we understand it, that Hall's evidence does show, or tend to show, that the three accomplices were in the defendant's office at the time of the conversation. But it is manifest that the evidence of Hall "of its own force, independently of the accomplices' testimony", proves nothing more than that Hall had such a telephone conversation with the defendant. It does not even prove that Reynolds was in his office at the time, because Hall testified that he "received a telephone call" from the defendant. It was not Hall, but the accomplices, who testified that they heard Reynolds talking over the telephone. That was a matter about which Hall knew nothing. Thus, the contention comes to this, that evidence that Reynolds talked to Hall over the telephone on the day the crime was committed about a wholly unrelated matter corroborates the story of the accomplices that they were with the defendant in his office at that time plotting the commission of the crime.

The distinction between such evidence and evidence which satisfies the requirements of our statute is illustrated in some of the Oregon cases which have been cited. In *State v. Townsend,* supra, the charge was larceny of a cow. Evidence was given by one, not an accomplice, that on the night that the cow was stolen

the defendant came to a house about four or five miles from the town of Pendleton, "an out-of-the-way place", with the accomplice, and was introduced to the witness by the accomplice under an assumed name, and that soon after they both left. This occurred in the vicinity of the place where the crime was committed. These circumstances and others mentioned in the opinion were held to be sufficient corroboration. In *State v. Tranchell*, supra, where the charge was the unlawful operation of a still, testimony was given independently of that of the accomplice which placed the defendant at the scene of the crime. In *State v. Brake*, supra, a homicide case, there was an abundance of independent corroboratory evidence, such, for example, as evidence of the fact that the defendant was in possession of the automobile in which the crime was committed a few hours after its commission. In *State v. Turnbow*, 99 Or. 270, 193 P. 485, 195 P. 569, the charge was assault with intent to rob, and there was independent evidence that the defendant was seen with the accomplice on the night of the assault; that he had been scheming to part the complaining witness from his money by means of an unlawful card game; that he had prepared himself with a pistol on the night of the assault; etc.

In these cases, and in every other Oregon case where a conviction was sustained upon the evidence of an accomplice, the corroboration disclosed facts and circumstances which, independently of the accomplices' testimony, were incriminating in their nature. The presence of the defendant at the scene of the crime in the Townsend and Tranchell cases was deposed to by witnesses other than accomplices. In the Brake case the possession of the vehicle in which the murder was committed was shown by like testimony, and the same thing is true of the corroborative evidence in the Turnbow case.

In none of them was it necessary to piece out the testimony of the corroborating witness with that of the accomplice to give point to the independent evidence. In none of them was the connection of the defendant with the crime made to appear "only when supplemented by certain testimony of the accomplice." In all of them there was evidence other than that of the accomplice which of its own force tended to incriminate the defendant.

It is urged by the state that there is further corroborative evidence of the telephone conversation between Reynolds and Hall in the failure of the defendant to deny the conversation or to make any explanation in regard to it. This, in our opinion, adds nothing to the effect of Hall's testimony. Whether Reynolds denied the conversation or not, for the purposes of the motion for a directed verdict Hall's testimony must be taken as true. The only implied admission by the defendant was, that he had such a telephone conversation on the afternoon of November 15, 1937. He did not admit that the three accomplices were present at the time of the conversation, but on the contrary denied expressly that they were ever in his office or that he had ever seen them before his arrest.

Every other item of evidence relied on by the state relating to the alleged visit of Newland, Carson and Moore to the defendant's office on the afternoon of November 15, 1937, is of a piece with Hall's evidence. The independent testimony about the convention picture, the .22 automatic, the barber shop across the street from the Labor Temple, and the age of Vida Dillon— which, incidentally, as we have stated, was not shown —proves nothing except that there was such a picture, such a gun, such a barber shop, and such a woman. But

the evidence that the accomplices saw Vida Dillon at the Labor Temple and discussed with Reynolds the picture, the pistol and the barber shop, comes solely from their lips. This is true also of the evidence regarding the newspaper articles, save that, as stated, we have been unable to find any testimony in the record coming from an independent source that such articles had been published. The state's brief fails to point out where such evidence can be found. Defendant's admitted presence in Eugene, and in his office between the hours of 5:00 and 6:00 p. m., on November 15, 1937, has no significance whatever. Eugene was his home, and it was not an incriminating fact for him to be in his own office, where, according to the record, he had legitimate business to transact. See *State v. Odell,* supra. And so of the fact that he attended a meeting of the Joint Council of the Teamsters' Union in Portland on November 10, 1937, five days before the perpetration of the crime. The only evidence with regard to this council is that it met to transact the lawful business of its members. Even though we should assume that some of its members were engaged in lawless activities, as the evidence indicates was true of the accomplices, Clarence Adams and Vern Bailey, connection with the crime cannot be inferred from participation in a meeting of an organization concededly lawful. It is not enough to show merely connection with the perpetrators of the crime. *Holmes v. State,* 52 Okl. Cr. 406, 5 P. (2d) 770; *State v. Pray,* 65 S. D. 1, 270 N. W. 512. The intimate association with the accomplice which may sometimes be sufficient, as stated in *State v. Brake,* supra, is an association accompanied by circumstances which lead to an inference of connection with the crime itself, such as appears in *State v. Townsend,* supra.

We come now to a consideration of the memorandum taken from the defendant at the time of his arrest. It will be recalled that it contained, in the defendant's handwriting, the names of Newland, Carson and Moore, followed by the words "from Dick Johnson", and that Johnson was a newspaper reporter in Eugene. The officer who made the arrest took from Reynolds a black book, which Reynolds asked him not to lose because it contained a piece of paper "that didn't mean anything but that he didn't want that lost." The defendant further said to the officer: "The paper has Dick Johnson's name on it of the News", and, when the officer found the paper, said: "That's the paper I had reference to." When asked by the officer how those three names happened to be on the paper (evidently referring to Newland, Carson and Moore), the defendant answered that "he had had conversation with Dick Johnson about those parties and he had wrote that down and put Dick Johnson's name underneath them." It appears without contradiction that Dick Johnson was a reporter on the Eugene Daily News. He was subpoenaed but not called by the state, and testified for the defendant, substantially corroborating the latter's explanation with reference to the memorandum. Reynolds testified:

"This Dick Johnson of the Register-Guard called me up when these names were first came in, the first news, the first time it had ever been published down here as the men confessing these crimes. He asked me what I knew about that. I said 'I never heard of them before, Dick.' He read the names over to me over the telephone and I says, 'Wait a minute' and I grabbed a pad on my desk and wrote the names down as he gave them to me and told him I would check our books and if any of them ever had been a member of this union or were members of this union I would let him know * * * ."

He further testified, in answer to a question as to what was the occasion of writing "from Dick Johnson" on the pad:

"I wanted that down there to remind me and if I checked these names and found out I wanted word to go back to Dick of the union they belonged to."

Johnson testified that on the morning of February 8th he read in the Oregonian about the arrest of Al Banks, and Carson, Newland and Moore. A wire story to the same effect was coming into the newspaper office at the time, and: "I immediately called Mr. Reynolds and informed him of this story that was coming in and asked him if he knew anything concerning Newland, Carson and Moore. I repeated those names to him. He said he did not and asked me to wait a minute and then had me repeat them very slowly." The witness asked Reynolds if they were members of the Teamsters' Union at Eugene or any other place and to make a check on the names and if Reynolds found out anything to let him know.

It should be remembered that Reynolds was arrested on February 9, 1938, approximately two months and three weeks after the date of the alleged crime, and the memorandum was found in his possession on the day after the news had been published in the press that Newland, Carson and Moore had been arrested. The only evidence in the record upon the point is that this news story stated that the accomplices had been arrested, not for breaking the windows in the City Barber Shop in Eugene but for the arson of a sawmill in Salem. This testimony came from the witness Johnson. It stands uncontradicted, and since it lay within the power of the state to refute it if false we must accept it as true. Moreover, so far as the record discloses,

the defendant was not informed by the arresting officers of the specific charge against him. He was arrested on a warrant which charged him merely with conspiracy to commit a felony, and which was read to him by one of the officers.

■ All that the state claims for the evidence regarding the memorandum taken from the defendant is contained in the following excerpt from the brief:

"It is and was the contention of the State that the writing down of the names of these men with the words 'from Dick Johnson' appearing thereafter was an act of defense on the part of the appellant Reynolds showing a desire not to have the names on this memorandum found in his possession or seen by anyone else without some explanation of the reason for his having them and, therefore, that the notation was an indication of a guilty conscience and evidence which tended to connect the appellant with the commission of the crime, which contention the State contends was further strengthened by the anxiety appellant displayed in regard to this slip of paper at the time of his arrest as above indicated."

But we think it far more reasonable to assume that one conscious of guilt and in fear of apprehension would not have had such a memorandum in his possession at all. Granted that the defendant's testimony in this regard and that of Johnson, a disinterested witness so far as it appears, might have been rejected by the jury, we are of the opinion that the mere possession by the defendant of this memorandum on March 9, 1938, is not a circumstance from which can be inferred association with the accomplices, much less connection with their crime, on November 15, 1937, and, further, that the defendant's conduct when taken into custody was not in the nature of an admission of guilt. "Misrepresentations, contradictions or silence of defendant when

accusing statements are made usually will have the same effect as a confession or admission as corroborative of the accomplice.'' 16 C. J. 707, § 1441, Criminal Law; *People v. Hendricks*, 71 Cal. App. 730, 236 P. 214. We are not prepared to extend that doctrine so as to embrace a case in which neither misrepresentation, contradiction or silence is shown, but only what seems to have been the entirely natural conduct of the defendant under the circumstances.

The danger of doing injustice to a possibly innocent man, one who at all events is entitled to the presumption of innocence, by holding evidence of this character to be sufficient corroboration of the testimony of an accomplice, becomes apparent when we think that on that theory, under precisely the same evidence, he could have been convicted of the crime of burning the Salem mill, of which he has not been accused, had the accomplices chosen to implicate him in that offense.

The testimony relative to statements made by the defendant at Dallas on the evening of the day that he was arrested apparently is not considered important by the state because in the state's brief it is not mentioned. We have set it forth, however, in our desire to include in this opinion every item of evidence for which anything might be claimed in support of the verdict. It has been held that the fact that at or about the time of the commission of the offense with which defendant is charged he and the accomplice were together, in apparent intimacy, in the neighborhood of the place where the crime was committed, may sufficiently connect defendant with the commission of the crime to furnish the necessary corroboration of the accomplice, especially where defendant has subsequently falsely denied his association with the accomplice, or where defendant and his accomplice were not only together but had the

fruits of the crime in their possession. See 16 C. J., Criminal Law, 708, § 1446; *Commonwealth v. Chase,* 147 Mass. 597, 18 N. E. 565; *Fort v. State,* 52 Ark. 180, 11 S. W. 959; 20 Am. St. Rep. 163. The somewhat equivocal answers of the defendant to questions asked him by the police officers while he was in custody in the course of an examination which lasted for three hours and fifteen minutes are not, in our opinion, to be considered as admissions and do not bring the case within the foregoing rule.

We find no occasion to discuss other contentions of the state which, in the end, depend upon the wholly indefensible proposition that an accomplice may corroborate himself. Nor is it necessary to do more than state the claim, which carries with it its own refutation, that evidence that the defendant had money in his possession on the day of the crime, tends to prove that he used it for criminal purposes.

■ We have examined the testimony in the light of the following rule found in 1 R. C. L. 170, and approved by this court in *State v. Young,* supra, and *State v. Brazell,* 126 Or. 579, 269 P. 884:

"Where it is objected that there is no corroboratory evidence tending to connect the defendant with the commission of the offense, it has been stated that the rule of appellate courts to test the legality of the verdict is to take the strongest statement of the case against the defendant that the evidence would warrant the jury in finding if the facts were specially found."

To our minds, the evidence seems wholly insufficient.

Whether the circumstances relied on by the state are viewed separately or together the result is the same. Most of them, as we have seen, must depend on the testimony of the accomplices themselves if they are to

have any bearing whatever. The only exceptions are with regard to the meeting of the Joint Council of the Teamsters' Union at Portland on November 10, 1937, the facts surrounding the defendant's arrest, the statements made by him at Dallas, and, we might add, his asserted motive. These circumstances do no more than to create a suspicion. The reason why it is the policy of our law that a defendant may not be convicted upon the testimony of an accomplice unless there is other evidence which, taken by itself and without regard to the testimony of the accomplice, tends to connect the defendant with the commission of the crime, is because, as has often been said, accomplice testimony comes from a corrupt and polluted source, and any other rule would expose to the peril of unjust conviction innocent men whom the accomplice might find it to his interest to implicate in his crime. We have found no case in which a conviction has been sustained on evidence as weak as the evidence in this record. We have seen cases where on much stronger evidence convictions have been reversed. See, *People v. Anthony* (Cal. App.) 84 P. (2d) 523; *State v. Keckonen* (Mont.) 84 P. (2d) 341. If the circumstances relied on by the state here are to be held sufficient then, in our opinion, the protection of the statute is gone.

The state argues: ''The criminal act had all the earmarks under the circumstances of having been committed by some organization or group of men, and appellant's position fitted him into that organization or group of men.''

It may be conceded that the criminal act had all the earmarks of having been committed by some organization or group of men.

Indeed, if the testimony on behalf of the state be true the crime was planned and carried through by the

representatives of two organizations—the Boss Barbers at Eugene and the Teamsters' Union—cooperating to a common criminal end. But we do not understand that it is intended to be argued that membership or official position in either of these organizations suffices in itself to corroborate the testimony of the accomplices. Manifestly, the defendant's complicity is not shown by the mere fact that he was secretary of the Central Labor Council and secretary of the Teamsters' Union at Eugene. Something more than that is required. The crime must be fastened on the individual and the proof must measure up to the standard fixed by the law of the state. "The legislature," said this court, speaking through Mr. Chief Justice BEAN, in *State v. Carr*, 28 Or. 389, 395, 42 P. 215, "in its wisdom, has declared that no person shall be convicted of a crime in this state upon the uncorroborated testimony of an accomplice, and upon it and not the courts must rest the responsibility for the consequences."

■ This court does not pretend to be unaware of the recent reign of crime and terror in Oregon instigated by lawless labor leaders, and it realizes that it is at least as important to bring to justice those in high positions who planned outrages against law-abiding individuals and the peace and dignity of the state, and paid men like Newland, Carson and Moore to perpetrate them, as it is to punish their hirelings. But that is beside the point. The immediate question with which we have to deal is the sufficiency of the evidence in the case at hand, and, after a most painstaking examination of the record before us and careful consideration of the contentions of the state and the controlling rules of law as uniformly laid down by this court, we are satisfied that the evidence of the accomplices, whether true or false, has not been corroborated in the manner

required by the statute. The defense was in the nature of an alibi, that is, the defendant testified that he was not in his office at all on the afternoon of November 15, 1937, except for about a half hour between 5:00 and 6:00 o'clock and that he did not know the accomplices, Newland, Carson and Moore, and had never heard of them until the news of their confession was published in the press of March 8, 1938. As to his guilt or innocence, we express no opinion, since that is not within our province. Our sole duty is to pass on questions of law raised on the record. It is a case where, as stated in *Stokes v. State,* 19 Ga. App. 235, 239, 91 S. E. 271, every circumstance proved by witnesses, not accomplices, "could have been admitted and no connection between the accused and the commission of the crime would be established unless the testimony of the accomplice be brought to its aid." And see, *People v. Anthony,* supra.

In view of another trial we will notice briefly the assignments of error based on exceptions taken to the rulings of the court admitting evidence over the defendant's objections. Assignments of error numbered 1 and 2 may be considered together.

Number 1 relates to the testimony of the witness, McCauley, relative to his conversation with Ray W. Blaine on the evening of November 15, 1937. The substance of the evidence covered by this assignment has already been set forth, and, in brief, it is to the effect that Blaine asked McCauley for the sum of $60 to pay the three accomplices in Reynolds' office and that McCauley gave Blaine $25 in cash and a check to deliver to Reynolds. Assignment Number 2 complains of the ruling of the court permitting Clarence Adams to testify that he sent Newland, Carson and Moore to Eugene.

■ We think that the testimony objected to was clearly admissible under the rule that evidence may be given on the trial after proof of a conspiracy of the declaration or act of a co-conspirator against his co-conspirator and relating to the conspiracy. Sec. 9-226, Oregon Code 1930; *State v. Boloff,* 138 Or. 568, 596, 4 P. (2d) 326, 7 P. (2d) 775, and cases there cited. From the testimony of McCauley that several days after the commission of the crime he received back from Reynolds the check which he gave to Blaine it may be inferred that Blaine went to McCauley as Reynolds' emissary. From the testimony of the accomplices, Newland, Carson and Moore, that they went to Eugene at the direction of Adams, and saw Reynolds, who employed them to break the windows in the City Barber Shop, a prior understanding between the witness, Adams, and the defendant, may be inferred. In other words, the jury would have been justified in finding that a conspiracy, to which the defendant was a party, was in progress during the time to which the testimony of both of these witnesses relates, and consequently whatever any of the conspirators did or said while engaged in the furtherance or execution of the common design was admissible against the defendant.

■ Assignment Number 3 is based on the admission of evidence of the testimony of the accomplices, Newland, Carson and Moore, that they broke the windows in the City Barber Shop a second time on their return from San Francisco in the early morning of November 19, 1937, This, according to the accomplices' testimony, was in fulfillment of their agreement with the defendant, to do a good job. The windows had not then been repaired and we think the testimony was admissible as part of the *res gestae* (Sec. 9-206, Oregon Code 1930),

and that the ruling of the trial judge finds support in *State v. Gillis,* 154 Or. 232, 239, 52 P. (2d) 679.

For the reasons herein given we are of the opinion that the learned trial judge erred in denying the defendant's motion for a directed verdict of acquittal. It results that the judgment must be reversed and the cause is remanded to the circuit court for a new trial.

RAND, C. J., and BELT, J., dissent.